Filed 4/28/14  Holt v. Denholm CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CLUNIES A. HOLT et al., | |
| Plaintiffs and Appellants, | G045496 |
| v. | (Super. Ct. No. 06CC12290) |
| DAVID M. DENHOLM et al., | O P I N I O N |
| Defendants and Appellants, | |
| HGC LLC et al., | |
| Defendants and Respondents. | |

Appeal from a judgment and postjudgment orders of the Superior Court of Orange County, David C. Velasquez, Judge.  Affirmed.

Law Office of William B. Hanley and William B. Hanley; Law Office of Laura Sullivan and Laura M. Sullivan for Plaintiffs and Appellants.

Hinojosa & Wallet, Jeffrey Forer and Shannon H. Burns for Defendants and Appellants.

Sainick & Whitney and Richard P. Whitney for Defendants and Respondents HGC, LLC and Waterpointe Development Companies, LLC.

Mandel, Norwood & Grant and S. Jerome Mandel; Reed Smith and Raymond A. Cardozo for Defendants and Respondents Nicole Biel and Timothy H. Harris.

\*   \*   \*

This court has before it several appeals arising from a long drawn out dispute among the beneficiaries of a family trust (the Trust) formed in 1973.  Two of the beneficiaries who are mother and daughter, Clunies A. Holt and Clunies E. Holt (individually Clunies A. and Clunies E. but will be collectively referred to as the Holts unless the context requires otherwise), filed civil and probate actions, challenging the conduct of another beneficiary, David M. Denholm (Denholm).  He also served as trustee for over 30 years.  On May 6, 2011, the trial court entered judgment in the civil action, awarding the Trust over $5 million.

Earlier this year, we affirmed two probate court orders.  In *San Pasqual Fiduciary Trust Company v. Clunies A. Holt* (Nov. 8, 2011, G046003) [nonpub. opn.] (*San Pasqual I*), the Holts challenged the probate court's order granting the interim trustee's petition for instructions about leasing real property of the Trust and directing the payment of net income to Clunies A.  We rejected the Holts' contention the trustee lacked standing to bring the petition and determined Clunies A. was not entitled to additional income.  In *San Pasqual Fiduciary Trust Company v. Clunies A. Holt* (Nov. 8, 2011, G047029) [nonpub. opn.] (*San Pasqual II*), the Holts challenged the probate court's order granting the interim trustee's petition for instructions about what conditions, if any, should be placed on the required distribution of one-half of the Trust's principal to Denholm, in light of the over $5 million civil judgment Denholm may owe the Trust if he

2

loses his appeal currently before us, challenging that judgment. We affirmed the probate court's order holding (1) Denholm was a beneficiary having a vested interest in 50 percent of the Trust's assets, which will include the civil judgment, and (2) distribution of those assets must be made whenever the remittitur issues in the appeals we now have before us.

In this opinion we have for our consideration two appeals challenging different aspects of the civil judgment. In one appeal, the Holts challenge the court's order dismissing the following persons and entities from the lawsuit: (1) Denholm's partner, Timothy H. Harris (Harris); (2) Denholm's ex-wife, Nicole Biel (Biel); (3) Denholm's company HGC Irvine, LLC (HGC); and (4) Denholm's business partner, Waterpointe Development Companies, LLC (Waterpointe). The Holts maintain the court erred in finding these entities not liable for Denholm's misconduct pursuant to the legal theory of agency. In addition, the Holts maintain the court should have created a constructive trust, denied HGC's and Waterpointe's request for attorney fees, found Denholm liable for elder abuse, and awarded additional damages for several of Denholm's transactions using the Trust's funds under Probate Code section 16440, subdivision (a).[1]

In the other appeal, Denholm raises the following issues: (1) the court's decision was based on erroneous statements of the law regarding beneficiaries; (2) the court erred in refusing to allow parol evidence regarding the settlors' intentions; (3) the court erred in refusing to allow evidence to support the reduction of damages to reflect only the net value damages to the Trust; (4) the statement of decision was inconsistent

---

[1] All further statutory references are to the Probate Code, unless otherwise indicated.

3

with the judgment and evidence presented at trial; and (5) there was insufficient evidence to support the court's decision Denholm was liable for constructive fraud.[2]

We affirm the judgment and the attorney fee order. We grant Denholm's request for judicial notice.

I

FACTUAL & PROCEDURAL BACKGROUND

In the interests of clarity and convenience, we will discuss in detail the facts relevant to each appeal separately. However, the following introductory facts are common to all the appeals: The case concerns the David Scott Denholm and Clunies Manson Denholm Trust dated April 2, 1973 (the Trust). David Scott Denholm (Father) died in 1984 and Clunies Manson Denholm (Mother) died in 2005. The Trust is irrevocable. The primary beneficiaries of the Trust are the settlors' son, Denholm, and daughter, Clunies A. Denholm was the trustee of the Trust from its inception until he resigned in December 2007. The court appointed San Pasqual Fiduciary Trust Company (San Pasqual) as the interim trustee.

The Trust provided that after Mother's death, Denholm became a 50 percent income beneficiary until the fifth anniversary of her death. After that date, Denholm was entitled to receive a distribution of one-half of the Trust's assets. Clunies A. was also a 50 percent income beneficiary until the fifth anniversary date, after which she was to be the sole income beneficiary of the Trust. Clunies A.'s three children, Clunies E., James Holt, Jr., and Cameron Holt Schmidt, were entitled to whatever assets remained in the Trust upon Clunies A.'s death.

Denholm is a real estate developer. He entered into various real estate ventures, investing the Trust's money, by creating and using various LLCs (LLCs),

---

[2] In a separately filed opinion we considered two additional appeals by these same parties regarding postjudgment attorney fee orders. We affirmed the orders. (*Clunies A. Holt v. David M. Denholm* (April 28, 2014, G046293) [nonpup. opn.].)

4

corporations, and partnerships. Relevant to these appeals, the Holts sued the following entities (hereafter referred to collectively as the Denholm Related Entities, unless the context requires otherwise): (1) DDC Vander, LLC (Vander); (2) DDC McGraw, LLC (McGraw); (3) La Grange, Ltd. (La Grange); (4) 221 Opal, LLC (Opal); (5) 115 Topaz, LLC (Topaz); (6) 320 Amethyst, LLC (Amethyst); (7) CALCO Santa Ana II, LLC (CALCO II); (8) CALCO HGC I, LLC (CALCO I); (9) CALCO Properties, LLC (CALCO Properties); (10) Snowco, LLC (Snowco); (11) C. Snowco, LLC (C. Snowco); (12) Evergreen Midtown Plaza LLC (Evergreen); (13) 2622 Santa Ana, LLC (SA); (14) CABOCO, LLC (CABOCO); (15) DDC Restaurants, Inc. (DDC); (16) Bundy Plaza-WLA, LTD (Bundy Plaza); (17) 2295 Pacific, LLC (Pacific); (18) 610 Poinsettia, LLC (Poinsettia); (19) Fox Hills Business Park, LP (Fox Hills); (20) Sword I, Inc. (Sword); (21) Anndeen Ltd. (Anndeen); and (22) Denholm, Harris & Company (DHC).

The Holts sued Denholm, the Denholm Related Entities, Harris, HGC, Waterpointe, and Biel (then using the name Nicole Denholm). The operative complaint, the fifth amended complaint (FAC), alleged the following causes of action against Denholm: (1) breach of fiduciary duty (first and tenth causes of action); (2) constructive fraud (second cause of action); (3) aiding and abetting a breach of fiduciary duty (third cause of action); (4) fraud by concealment (fifth cause of action); (5) elder abuse (sixth cause of action); and (6) conversion (seventh cause of action).

The Holts also sued six LLCs[3] for aiding and abetting a breach of fiduciary duty (third cause of action). Waterpointe, HGC, CALCO I, and CALCO Properties were sued for aiding and abetting a breach of fiduciary duty (fourth cause of action) and for fraud by concealment (eighth cause of action). The Holts sued Biel for conversion (seventh cause of action). The Holts sued 15 Denholm Related Entities for fraud by

---

[3] The six entities were McGraw, Vander, CALCO II, CABOCO, Evergreen, and CALCO Properties.

concealment (ninth cause of action). They alleged all the defendants, except Waterpointe and HGC, were liable for fraud by concealment (fifth cause of action).

After the Holts presented their case-in-chief at trial, all the defendants (except Denholm) requested dismissal. The court granted the motion as to Biel, Harris, Waterpointe, and HGC. The court reserved ruling on the motions made by the other defendants. Two months later, at the end of trial, the court found in favor of all the remaining defendants, leaving only Denholm in the action.

The court found in favor of Denholm and against the Holts on the third, fourth, fifth, and sixth causes of action. It dismissed the tenth cause of action. It found in favor of Holts, "on behalf of the . . . Trust" and against Denholm on the first, second, and seventh causes of action (breach of fiduciary duty, constructive fraud, and conversion respectively). The court awarded the Trust damages totaling $5,751,682.18. After the judgment was entered, the court granted HGC and Waterpointe's request for attorney fees against "the plaintiffs, both jointly and severally," totaling $479,164.25.

II

THE HOLTS' APPEAL

The Holts argue the trial court erred in concluding there was no agency relationship between Denholm and Harris, Biel, HGC, and Waterpointe and for dismissing them from the action. In addition, the Holts maintain the court erred by not creating a constructive trust, by not finding Denholm liable for elder abuse, by not making an award for several of Denholm's transactions under section 16440, subdivision (a), and by awarding attorney fees to HGC and Waterpointe. We will address each issue separately.

A. *Dismissal Under Code of Civil Procedure section 631.8*

After the Holts rested their case, Harris, Biel, HGC, and Waterpointe filed motions to dismiss under Code of Civil Procedure section 631.8. On July 9, 2010, the court considered the parties' arguments and granted the motions. It concluded the Holts

6

had not carried their burden of proving the elements required for each cause of action alleged against these defendants.

### 1. Standard of Review

"'The purpose of Code of Civil Procedure section 631.8 is "to enable the court, when it finds at the completion of plaintiff's case that the evidence does not justify requiring the defense to produce evidence, to weigh evidence and make findings of fact." [Citation.] Under the statute, a court acting as trier of fact may enter judgment in favor of the defendant if the court concludes that the plaintiff failed to sustain its burden of proof. [Citation.] In making the ruling, the trial court assesses witness credibility and resolves conflicts in the evidence. [Citations.] [¶] On appeal, we view the evidence in the light most favorable to the judgment, and are bound by trial court's findings that are supported by substantial evidence. [Citation.] But, we are not bound by a trial court's interpretation of the law and independently review the application of the law to undisputed facts. [Citation.]' [Citation.]" (*Kinney v. Overton* (2007) 153 Cal.App.4th 482, 487.)

### 2. Liability Under an Agency Theory

At trial, the Holts asserted Harris, Biel, HGC, and Waterpointe were liable for Denholm's misconduct with respect to the Trust because he was acting as their agent. "'The question of whether there exists an agency relationship is one of fact [citations], and for the jury to decide unless the evidence is susceptible of but a single inference.' [Citation.] [¶] An agent 'is anyone who undertakes to transact some business, or manage some affair, for another, by authority of and on account of the latter, and to render an account of such transactions.' [Citation.] 'The chief characteristic of the agency is that of representation, the authority to act for and in the place of the principal for the purpose of bringing him or her into legal relations with third parties. [Citations.]' [Citation.] 'The significant test of an agency relationship is the principal's right to control the activities of the agent. [Citations.] It is not essential that the right of control be exercised

7

or that there be actual supervision of the work of the agent; the existence of the right establishes the relationship.' [Citation.]" (*McCollum v. Friendly Hills Travel Center* (1985) 172 Cal.App.3d 83, 91 (*McCollum*).)

"'"The essential characteristics of an agency relationship as laid out in the Restatement are as follows: (1) An agent or apparent agent holds a power to alter the legal relations between the principal and third persons and between the principal and himself; (2) an agent is a fiduciary with respect to matters within the scope of the agency; and (3) a principal has the right to control the conduct of the agent with respect to matters entrusted to him. [Citation.]" [Citations.]' [Citation.]" (*Garlock Sealing Technologies, LLC v. NAK Sealing Technologies Corp.* (2007) 148 Cal.App.4th 937, 964; see also Civ. Code, § 2295 ["An agent is one who represents another, called the principal, in dealings with third persons"].) As we will discuss, none of these elements were established in this case with respect to Denholm's relationship with HGC, Waterpointe, Harris, or Biel.

### 3. HGC & Waterpointe

The Holts claimed HGC and Waterpointe were liable for aiding and abetting breach of fiduciary duty (fourth cause of action) and fraud by concealment (fifth cause of action). Liability was premised on the legal conclusion Denholm was the agent of Waterpointe and of HGC, and his breach of fiduciary duty to the Trust should be directly attributable to these principals.

Before addressing the legal issues, it is helpful to understand the relationship between these parties. Garret Calacci (who is not a party to this action) is a real estate developer. He and Denholm created several LLCs in 2003 before acquiring and developing property located in Irvine, California (hereafter the Irvine property). Specifically, they created the following three LLCs: (1) Denholm created CALCO I to serve as the investor for the deal; (2) Calacci created Waterpointe for the purpose of developing real estate and serving as manager of the Irvine deal; and (3) the above two

8

LLCs created a property development company, HGC, for the sole purpose of acquiring and developing the Irvine property. The operating agreements relating to each of the above LLCs clearly explain the roles and duties of the various parties, which of course are relevant to the issue whether there exists an agency relationship between each LLC and Denholm.

### a. HGC's Operating Agreement

On July 28, 2003, Denholm formed the LLC named HGC. The operating agreement stated HGC was formed to acquire title to the Irvine property, construct six homes, and upon completion sell all the properties. The agreement specified the company had only two initial members, Waterpointe and CALCO I.

The HGC operating agreement specified Waterpointe was not required to make a capital contribution but would instead supply management services in exchange for a 50 percent interest in the company. Calacci agreed to be HGC's sole manager.

The operating agreement designated CALCO I as the member responsible for making a capital contribution of $850,000 in exchange for a 50 percent interest in the company. CALCO I was referred to in the agreement as the "investor" and had no specified management duties. In addition, the operating agreement stated the original 50/50 equity share would change to 60/40, depending on who served as guarantor for the required construction loans.

### b. Waterpointe's Operating Agreement

The same day HGC was created, Calacci and his wife formed the LLC named Waterpointe (then known as HCG International LLC). Waterpointe's operating agreement stated the company was formed for the general purpose of acquiring, owning, financing, operating, developing, and selling real property. It was not created solely to develop the Irvine property. The Waterpointe operating agreement listed Calacci as the sole manager of the LLC.

9

### c. CALCO I's Operating Agreement

Also on the same day CALCO 1, another LLC, was formed by the following four members: (1) CALCO Properties, a LLC managed by Denholm and having a 12.5 percent interest; (2) Denholm in his trustee capacity of the Trust, having a 72.91 percent interest; (3) Jack Gray, having a 9.72 percent interest; and (4) Eric Conella, having a 4.86 percent interest. The operating agreement stated CALCO I was to be co-managed by Lori Collins and Denholm.

The operating agreement stated the purpose of CALCO I was to "enter into an operating agreement with [Waterpointe] for the formation of HGC . . . ('Development Company') on such terms as are approved by the [m]anager. [HGC] shall acquire an interest [in the Irvine property] and plan, entitle, construct and sell [six] houses on the [p]roperty. The [c]ompany [CALCO I] shall make an investment in [HGC] and act as a member of [HGC]. [CALCO I] shall have no other purpose." In short, CALCO I was formed for the sole limited purpose of investing in HGC.

### 4. HGC's Development of the Irvine Property

It is undisputed that all proceeded according to plan. CALCO I complied with its contractual obligation to supply an initial capital contribution of $850,000. It also became the financial guarantor to HGC's $2,905,000 construction loan as provided for in paragraph 4.4 of the operating agreement. When this occurred, the operating agreement provided CALCO I's membership interest would increase from 50 to 60 percent, and Waterpointe's equity share would decrease from 50 to 40 percent.

Waterpointe managed the project (complying with the management duties listed in paragraph 5.1 of the operating agreement) and eventually built and sold six homes on the Irvine property. At trial, Calacci testified that as manager of Waterpointe, he had spent approximately 3,000 hours on the project for which Waterpointe was paid a management fee of $60,000.

## 5. *The Agency Issue*

On appeal, the Holts maintain the court erred in refusing to apply fundamental agency principles and refused to recognize Denholm was the authorized agent of Waterpointe and HGC when he raided the Trust to invest $850,000. The Holts argue that within the scope of that agency relationship, Denholm improperly used the Trust's assets to fund HGC. The Holts conclude Waterpointe and HGC are vicariously liable for Denholm's torts. To support their argument, they provide case authority generally holding a principal is liable to third parties for the torts committed by their agents.

Noticeably missing from the Holts' argument regarding these defendants is any case authority or discussion of the legal elements required to create an agency relationship. Instead, the Holts simply assert Denholm's role in *funding* and *management* of the project necessarily created the required agency relationship. They boldly assert agency was "[u]ncontroverted." This is simply not true. And for this reason, we find their case authority and legal analysis on the secondary issue of *when* a principal is liable for the misconduct of its agent irrelevant. An agency relationship must first be established.

We agree with the trial court's conclusion the Holts failed to carry their burden to prove Denholm was acting as an agent for either Waterpointe or HGC when he took money from the Trust to invest in the Irvine properties. As stated above, an agency is generally a consensual relationship based on the parties' intent. It can be created when there is evidence the principal intended to appoint a person (or entity) as his or her agent, and the agent has agreed to accept the appointment. "'The significant test of an agency relationship is the principal's *right to control* the activities of the agent. [Citations.] It is not essential that the right of control be exercised or that there be actual supervision of

11

the work of the agent; the existence of the right establishes the relationship.' [Citation.]" (*McCollum, supra,* 172 Cal.App.3d at p. 91, italics added.)

We found nothing in the operating agreements of Waterpointe or HGC giving either entity the right to control Denholm's conduct with respect to the Trust, and nothing suggesting these entities had any authority to interfere with Denholm's individual and fiduciary duty as trustee of the Trust. To the contrary, the two operating agreements plainly state Waterpointe and HGC were created for the express purpose of developing real estate and nothing more.

It is apparent the Holts fail to appreciate CALCO I independently and contractually agreed to invest money in the project in exchange for a membership interest in HGC. There is no evidence, and the Holts cite to none, proving Denholm made a financial contribution from the Trust *on behalf of* HGC or its managing member, Waterpointe. Rather, the evidence shows the investment was made on behalf of the Trust as a member of CALCO I. HGC and Waterpointe had no right to control Denholm's activities with respect to the Trust or CALCO I.

The Holts, without citation to the record or case authority, argue that because Waterpointe *authorized* Denholm and CALCO I to fund HGC, this authorization created an agency relationship. We agree the operating agreement created a funding obligation, but the scope of authorization with respect to finances did not include trustee duties or control over the Trust's assets.

The operating agreement simply authorized Waterpointe to *ask* CALCO I for money and for assistance securing construction loans. For example, paragraph 4 of the operating agreement, titled "Capital Contributions" outlined CALCO I's financial commitment in its role as "investor." Paragraph 4.2 of the operating agreement required CALCO I, the "investor," to contribute money each month as "requested by the [m]anager." Paragraph 4.2.3, titled "Development Stage Funding" stated CALCO I shall

12

make a capital contribution of no more than $850,000 to HGC. Paragraph 4.4 stated the parties agreed HGC's business would be financed in part with funds borrowed from third party lenders, and members "shall use their best efforts and act in good faith" to assist the manager in procuring financing. We found no language in the operating agreement requiring a specific source of funding. The Trust is not mentioned anywhere in the agreement. Moreover, the management terms of the operating agreement simply do not support the theory Waterpointe was authorized to direct or control where CALCO I came up with the money. It was not listed as one of Waterpointe's management duties. CALCO I's duties as an investor arose from a contractual obligation created by its own desire to purchase membership rights in the LLC.

Similarly the Holts' suggestion an agency relationship was created because Waterpointe "delegated its [management] duties" to Denholm lacks merit. They assert Waterpointe was authorized under the operating agreement to delegate its management responsibilities and it "ultimately delegated control of the project and overall management to Denholm." Again, the facts do not support this conclusion.

The Holts cite to the following five facts as proof Denholm became HGC's primary manager: (1) Denholm oversaw Calacci's activities, and Calacci was Waterpointe's "nominal manager"; (2) Denholm made cash distributions to himself for management services; (3) Denholm obtained documents required by Costa Mesa; (4) Denholm arranged for cash collateral and guarantees; and (5) Denholm arranged financing for HGC. As discussed above, the last two factors do not relate to management duties but rather to Denholm's (and CALCO I's) contractual obligations as the investor, pursuant to the terms of HGC's operating agreement. As stated above, CALCO I provided funding and loan guarantees in consideration for a 60 percent membership interest in HGC. In light of this agreement, financial contributions do not prove Denholm was HGC's primary manager.

13

As for the remaining three purported facts, none are supported by the record. First, there is no evidence to support the contention Calacci was Waterpointe's *nominal* manager. Waterpointe's operating agreement plainly states Calacci was Waterpointe's *only* manager. Calacci testified he was entirely responsible, through Waterpointe, to manage the construction and sale of the six homes on the Irvine property. Calacci testified Denholm was not required under the operating agreement to do anything with regard to management, "[h]e was just an investor through his entity CALCO[] I." Denholm confirmed in his testimony that the project was managed solely by Waterpointe/Calacci.

The second factor is also not supported by the record. Denholm did not make a cash contribution to himself for management services. Denholm and Calacci testified they agreed in 2005 to pay Denholm $60,000 from the construction loan. Calacci explained the lender would not pay the money as an advance of profits but would pay the money if it was called "management fees." Denholm and Calacci made an oral agreement the $60,000 would be deducted from CALCO I's profits because Calacci was under the mistaken impression Denholm owned CALCO I. Thus, Denholm's cash distribution from the construction loan was intended to represent an early distribution of the profits owed to CALCO I. The evidence was undisputed the $60,000 was labeled a management fee to satisfy the bank's requirements, not because Denholm engaged in any management services.

The Holts' third alleged "fact" also lacks evidentiary support. The Holts argue Denholm acted as a manager because he obtained "documents" required for construction by Costa Mesa. They do not describe the nature of these documents but provide record references from which it can be inferred they are referring to several letters of credit. It is undisputed Denholm directly played a role in obtaining the required letters of credit. However, Calacci explained that after CALCO I guaranteed the construction loan and received a greater interest in the company, it became

14

CALCO I's obligation to continue as the guarantor and obtain the letters of credit. Thus, once again, Denholm's role in the deal was limited to financial matters (as an investor through CALCO I), as provided by the operating agreement. Denholm's assistance in procuring letters of credit did not prove he played a management role that would create an agency relationship.

Moreover, the role of "manager" in a LLC is statutorily defined as the "person that under the operating agreement of a manager-managed limited liability company is responsible, alone or in concert with others, for performing the management functions stated in subdivision (c) of [Corporations Code s]ection 17704.07." (Corp. Code, § 17701.02, subd. (n).) Corporations Code section 17702.01, subdivisions (5), and (6), explain a company's articles of organization "shall state" if the LLC is to be "manager managed" or "to be managed by only one manager[.]" The LLC's operating agreement governs the "[r]elations among the members as members and between the members and the [LLC,]" including "the rights and duties . . . of a person in the capacity of manager." (Corp. Code, § 17701.10, subd. (a)(1) & (2).) HGC's operating agreement states it sole manger is Waterpointe. Calacci and Denholm both testified Waterpointe was the only manager of the LLC.

Alternatively, the Holts argue the court disregarded the agency principles regarding ratification. Civil Code section 2307 provides: "An agency may be created, and an authority may be conferred, by a precedent authorization or a subsequent ratification." "Ratification is the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him. [Citations.] [¶] A purported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is 'inconsistent with any reasonable intention on his part, other than that he intended

15

approving and adopting it.' [Citations.] It is essential, however, that the act of adoption be truly voluntary in character." (*Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73.)

The Holts argue Calacci ratified Denholm's breach of fiduciary duty to the Trust by accepting the funds "without any investigation" as to their source. Without supporting record citations, they also allege Calacci continued to use the Trust for his own benefit after learning there were beneficiaries other than Denholm and those beneficiaries were disputing Denholm's use of the Trust's assets.

We find there was no evidence of ratification because there is nothing to suggest that when Denholm raided the Trust he purported to be acting on behalf of HGC or Waterpointe. "A 'ratification can only be effectual between the parties, when the act is done by the agent avowedly for or on account of the principal, and not when it is done for or on account of the agent himself, or of some third person[.]'" (*Watkins v. Clemmer* (1933) 129 Cal.App. 567, 570, italics omitted.) Denholm's decision to provide loan guarantees and use the Trust as collateral for letters of credit were actions taken on behalf of himself and his company CALCO I.

Because the trial court correctly determined there was insufficient evidence of an agency relationship, we need not address the Holts' assertion Waterpointe and HGC failed to prove their affirmative defense under section 18100. This statutory provision protects third parties who deal with trustees, if they act in good faith, for valuable consideration, and without actual knowledge the trustee exceeded his or her powers. (*Ibid.*) The Holts' argument is premised on the theory Denholm was acting on behalf of Waterpointe and HGC when he breached his trustee duties. We have already determined there is no evidence of such an agency relationship.

*6. Biel & Harris*

We will begin with a brief summary of the relationship between these parties and Denholm. Biel and Denholm married in 1970 and divorced 33 years later. During the marriage, Biel ran the household and Denholm took care of the couple's

16

finances. At first they lived in California and in 2001 they moved to Aspen Colorado (hereafter the Crystal Lake property). Biel testified she was not involved in Denholm's real estate deals, she signed whatever documents he asked her to sign, and she knew very little about the Trust or its business dealings.

During the divorce in 2005, Biel was represented by two attorneys. Under the terms of the settlement agreement she received a 77 percent interest in the Crystal Lake property, and a minority interest in two real estate ventures (Bundy Plaza and Fox Hills).

Harris and Denholm have been long-term friends since college. Harris resides in Idaho and is a real estate investor and developer. In the 1970's, Denholm and Harris together invested in real estate ventures, forming limited partnerships and LLCs to facilitate those deals. They each own a 50 percent interest in DHC, a general partnership created to serve as a property manager and bookkeeper for some of their joint business ventures. Harris testified that before the lawsuit, he had no information concerning the Trust other than the knowledge Denholm was the trustee of a family trust that owned commercial property. Harris stated he never conducted any business with the Trust and it was never named the investor in any of his real estate ventures with Denholm.

In the fifth cause of action, the Holts alleged Biel and Harris (along with all the other defendants except Waterpointe and HGC) were liable for fraudulent concealment. The Holts alleged the defendants "engaged in a fraudulent scheme and plan to use [the Trust] and its assets for their own personal use, gain, and profit and to the detriment of the Trust and its beneficiaries." The Holts also alleged Biel was liable for conversion (the seventh cause of action). Specifically, they alleged Biel and Denholm used money from the Trust as security for loans to purchase and build a home, to pay their taxes, and to generally "maintain their personal income and lifestyle."

On appeal, the Holts do not discuss the elements of these two causes of action (fraudulent concealment and conversion). Instead, they focus on evidence

17

suggesting there existed an agency relationship, rendering Biel and Harris vicariously liable for Denholm's misconduct with respect to the Trust. However in devoting over 40 pages of argument to the issue of agency, it becomes clear the Holts could not see the forest for the trees. The Holts fail to recognize the court determined *Denholm was not liable* for fraudulent concealment. If he did not commit this tort, then certainly his purported principals (Harris and Biel) cannot be held vicariously liable. The Holts did not seek our review of the court's ruling on fraudulent concealment in their appeal.[4]

Thus, regardless of a purported agency relationship created by Harris's general partnership with Denholm, we can think of no reason to hold Harris vicariously liable for fraudulent concealment when Denholm was exonerated of this allegation. Similarly, Biel cannot be found to have engaged in a "scheme and plan" of fraud by concealment with Denholm, if he was found not liable for such conduct.

As for the conversion cause of action alleged against Biel, the court ruled the Holts did not carry "their burden to prove by the preponderance of the evidence: (1) that . . . Biel intentionally and knowingly took possession of property to which the . . . Trust or the . . . beneficiaries had an immediate right to possess or which was a specifically identifiable sum of money; (2) that . . . Biel exercised ownership, dominion[,] or control over property to which the . . . Trust had an immediate right to possess or which was a specifically identifiable sum of money; and (3) that any conduct of . . . Biel was a substantial factor in causing any harm suffered by the Trust or its beneficiaries." In

---

[4] The Holts make a weak attempt in a footnote to argue the court's statement of decision contains a clerical error and judgment was not granted for Denholm on the fraudulent concealment claim. The argument is based on statements the court made regarding concealment in its written ruling regarding the first, second, and seventh causes of action for breach of fiduciary duty, constructive fraud, and conversion. However, the statement of decision repeatedly states the fifth cause of action for fraudulent concealment lacks any factual basis and the court ruled in favor of the named defendants, including Denholm. It expressly stated, "[T]his [c]ourt finds in favor of . . . Denholm and against [the Holts] on the [f]ifth [c]ause of [a]ction . . . ."

18

addition, the court concluded the Holts failed to prove Biel approved, ratified, or "acted with particular knowledge of the acts of Denholm that constituted his alleged breaches of fiduciary duty to the . . . Trust." In short, the court found many of the elements of a conversion claim were not established.

"'Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion are the plaintiff's ownership or right to possession of the property at the time of the conversion; the defendant's conversion by a wrongful act or disposition of property rights; and damages.'" (*Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 451-452 (*Farmers*).)

"Money can be the subject of an action for conversion if a specific sum capable of identification is involved. [Citation.] [¶] Neither legal title nor absolute ownership of the property is necessary. [Citation.] A party need only allege it is '*entitled to immediate possession at the time of conversion*. [Citations.]' [Citation.] However, a mere contractual right of payment, without more, will not suffice. For example, in *Imperial Valley L. Co. v. Globe G & M Co.* (1921) 187 Cal. 352 . . ., the tenant entered into an agreement to raise crops on leased land and to pay the landlord one-fourth of the crop as rental. However, the tenant sold the entire crop and the proceeds were used to pay other debts of the tenant. The landlord brought an action for conversion. The Supreme Court concluded no claim was stated because the rental agreement established no title to or lien upon the crop but only established the measure of damages for breach of contract. (*Id.* at pp. 353–354.)" (*Farmers, supra,* 53 Cal.App.4th at p. 452.)

On appeal, the Holts offer no arguments regarding the court's conclusion they failed to meet their burden of showing Biel possessed property the Trust or the Holts had an *immediate right* to possess or which was a *specifically identifiable sum* of money. Nor do they attempt to refute the court's conclusion there was no evidence Biel's conduct "was a substantial factor in causing any harm suffered by the Trust or its beneficiaries." The Holts focus only on evidence refuting the court's conclusion Biel did not

19

"intentionally and knowingly" take possession of property belonging to the Trust. By failing to address the other required elements and ignoring the evidence supporting the court's ruling, we agree with Biel's assertion the claim on appeal is waived. Biel was entitled to a judgment in her favor if the Holts failed to prove any of the elements required for conversion.

Moreover, we conclude there was evidence to support the trial court's conclusion Biel did not take any action adverse to the Holts' interest in the Trust's assets. The Holts proved and the court agreed Denholm was liable for conversion when he used and borrowed the Trust's funds for his personal benefit. In their argument, it appears the Holts recognize Biel did not independently participate in the conversion other than to personally benefit from Denholm's misconduct. Specifically, she acquired an interest in the Crystal Lake property that Denholm originally financed by borrowing money from the Trust. As noted by Biel on appeal, there is no evidence she saw the money Denholm borrowed from the Trust and by the end of 2001, Denholm repaid all the loans using the sale proceeds from the couple's Corona Del Mar home. Biel stated she did not know Denholm could not borrow money from the Trust.

Alternatively, the Holts assert Biel is vicariously liable for Denholm's wrongful conversion of trust funds. They assert the evidence proved "the money Denholm took from the Trust was largely *taken on Biel's behalf*[,]" that she likely knew he was borrowing from the Trust, and she never objected or told the Holts about the loans. They focus on evidence Biel *delegated* all matters of marital finances and she had actual and constructive notice of Denholm's actions. In short, the Holts argue Biel should be held liable for conversion simply because she *accepted the benefits* of Denholm's alleged misconduct. They do not allege Biel independently engaged in any wrongful acts, but rather that under an agency theory, a wife is vicariously liable for the misdeeds of her husband.

20

Biel aptly calls this contention an "odd 'respondeat inferior' legal theory." The evidence was undisputed Biel had no involvement in the Trust's affairs. Yet the Holts wish to hold her liable under the theory Denholm was her agent when he breached his fiduciary duty to the Trust. For there to be an agency, there would need to be evidence Denholm was acting as Biel's representative. And, more importantly, for an agency relationship there would need to be evidence Biel had the right to control Denholm's dealings with the Trust. "'The significant test of an agency relationship is the principal's right to control the activities of the agent. [Citations.] It is not essential that the right of control be exercised or that there be actual supervision of the work of the agent; the existence of the right establishes the relationship.' [Citation.]" (*McCollum, supra,* 172 Cal.App.3d at p. 91.)

However, there is no evidence Biel had any authority to control or direct Denholm in his fiduciary duty and dealings with the Trust's assets. The Holts cite no authority, and we found none, holding a marriage contract is sufficient to confer a trustee's duty and authority to his or her spouse. To the contrary, we found authority holding the trustee of a trust has very limited authority to delegate his or her powers. "The trustee has a duty not to delegate to others the performance of acts that the trustee can reasonably be required personally to perform and may not transfer the office of trustee to another person nor delegate the entire administration of the trust to a cotrustee or other person." (§ 16012, subd. (a); see *Gaver v. Early* (1923) 191 Cal. 123, 126-127 [liable for surrendering complete control over estate to attorney].)

Moreover, "In a case where a trustee has properly delegated a matter to an agent, cotrustee, or other person, the trustee has a duty to exercise general supervision over the person performing the delegated matter." (§ 16012, subd. (b).) Thus, Denholm could supervise Biel and delegate a matter to her as an agent, but the reverse is not possible. Biel had no authority to supervise or control Denholm's duties or powers as a trustee. To confer such authority, we would have to imply she was a cotrustee. But the

21

evidence clearly shows Denholm was the sole designated trustee. And his fiduciary duties as a trustee were legally distinct from his familial duties as Biel's spouse.

## B. *Constructive Trust*

The Holts argue the trial court erred in refusing to impose a constructive trust over Biel's 77 percent interest in the Crystal Lake property because she benefitted from Denholm's wrongdoing to the Trust. Biel asserts the court properly exercised its equitable discretion. She notes all money borrowed from the Trust was repaid in 2001, and her interest in the home was obtained via an equitable distribution in a divorce settlement. She adds the court awarded damages in lieu of imposing a constructive trust over the property, including the 23 percent interest owned by Denholm. She asserts that if the evidence did not justify a constructive trust on Denholm's share of the property, what evidence warrants imposition of a constructive trust over Biel's share. We agree with Biel and find no error.

"Section 16420, subdivision (a)[,] describes 'in general terms' the basic remedies for a breach of trust. [Citations] Section 16420 does not limit the availability of any particular remedy or explain its application in particular circumstances. The availability of a particular remedy and its application in particular circumstances are governed by the common law. [Citation.] The basic remedies include monetary relief (§ 16420, subd. (a)(3)), an equitable lien or constructive trust (§ 16420, subd. (a)(8)), and recovery of a specific asset through tracing (§ 16420, subd. (a)(9)), among other remedies. A petitioner can seek the disgorgement of the trustee's profits (§ 16440, subd. (a)(2)) through a money judgment against the trustee (§ 16420, subd. (a)(3)), or seek to establish an equitable interest in specific assets through a judgment in rem (§ 16420, subd. (a)(8), & (9)). These are separate remedies; one remedy does not limit the other." (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 892-893, fn. omitted (*Uzyel*).)

Noticeably absent from the briefing are any record references showing when the Holts actually requested the court consider imposing a constructive trust on

22

Biel's share of the Crystal Lake property and, more importantly, if and when the court rejected such a request. The statement of decision makes no mention of a request for a constructive trust. The court awarded the Trust over $5 million based on the following "calculated damages": (1) $213,971 in damages from loans Denholm made to himself and underpaid interest; (2) $25,824 in damages from loans to third parties and in which Denholm had an interest; (3) disgorgement of profit and income belonging to the Trust from several investments in which Denholm had an interest (McGaw, Catania, and Vander); (4) damages for the use of assets in connection with investments Denholm did not make a profit (CALCO II and CABOCO); and (5) damages from investments in which Denholm holds an interest (CALCO I, Opal, and Aspen Mountain Club).

As noted by Biel, the court had the discretion to award damages in lieu of a constructive trust. The Holts have given us no reason to disturb the judgment that already awarded damages for the loans Denholm made to himself, and that likely included the short-term loan relating to the Crystal Lake property.

## C. Additional Damages

Section 16440, subdivision (a), describes the measure of liability when a trustee commits a breach of trust. It states, "the trustee is chargeable with any of the following that is appropriate under the circumstances: [¶] (1) Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest. [¶] (2) Any profit made by the trustee through the breach of trust, with interest. [¶] (3) Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust." The Holts argue the court failed "to choose a method [described in section 16440, subdivision (a),] on each and every transaction involved in Denholm's egregious activities once the trial court found breach of trust." They assert the trial court "only awarded damages in a select few of the transactions and refused to make an award in others."

23

The Holts provide one record citation to support their argument the court refused to rule in their favor. They cite two pages of the judgment in which the court awarded damages and disgorgement of profits for several transactions involving the Trust's assets. As mentioned in the previous section, this portion of the judgment clearly shows the court "calculated damages" totaling over $5 million based the following five categories: (1) loans Denholm made to himself and underpaid interest; (2) loans to third parties and in which Denholm had an interest; (3) disgorgement of profit and income belonging to the Trust from several investments (McGaw, Catania, and Vander); (4) damages for the use of assets in connection with unprofitable investments (CALCO II and CABOCO); and (5) damages from other investments (CALCO I, Opal, and Aspen Mountain Club). The Holts provide no record citations to support their argument the court "refused to make an award in other [transactions]" not listed in the judgment.

This is problematic given our standard of review. As stated in the case repeatedly cited by the Holts, *Uzyel, supra,* 188 Cal.App.4th 866, we review for abuse of discretion the means by which a court chooses to remedy a breach of trust. "An abuse of discretion occurs only if the reviewing court, considering the applicable law and all of the relevant circumstances, concludes that the trial court's decision exceeds the bounds of reason and results in a miscarriage of justice. [Citations.]" (*Id.* at p. 911.)

The Holts discuss four transactions for which they believe the court refused to make an award using one of the methods set forth in section 16440, subdivision (a). Their six pages of argument are devoted almost entirely to rearguing the facts supporting the conclusion the transactions were profitable. First, they describe in detail a short-term loan of $297,000 made from the Trust to facilitate a 1031 tax deferred exchange after Denholm sold property for over $2 million (referred to as the LaGrange exchange). Second, the Holts state the Trust paid DHC to manage the Trust's property and "for other partnerships, such as La Grange, Bundy Plaza, Fox Hills, Anndeen and others." Without any meaningful discussion, the Holts summarily tell us there was evidence presented at

24

trial of over $1 million in profit disgorgement arising from transactions involving DHC (Denholm and Harris' partnership). Third, the Holts assert the court failed to address Denholm's decision to borrow $200,000 from the Trust for one year to open escrow on property located in Colorado (referred to as the Snowco transaction). And finally, the Holts devote one sentence to describing the "Fox Hills Transaction" stating, "Harris, as a general partner and Fox Hills, along with Denholm are liable for misuse of trust monies." There is no mention of the type of misuse, a dollar amount, or a suggested remedy. In his brief, Denholm explains the "Fox Hills Transaction" concerned a $150,000 loan from the Trust, secured by a promissory note, and repaid at the rate of 10 percent interest.

As with the Holts' constructive trust argument discussed above, we will not assume (absent supporting citations to the record) that the court "refused" to assess liability or ignored breaches of trust. Denholm asserts these transactions were either addressed in the court's award or relate to transactions in which no profits were made. He discusses the evidence presented at trial that supports the court's judgment. In their reply, the Holts reassert there was evidence the transactions were profitable, but fail to refute the contrary evidence presented by Denholm, and again boldly assert the court "refused" to make an award.

Our task as an appellate court is not to reweigh the evidence but to review the court's rulings for abuse of discretion. The Holts' briefing is insufficient in this regard, and we deem the issue waived. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.) The Holts made no meaningful effort to address the issues presented, i.e., why did the court refuse to find Denholm liable for those four transactions. There could be several reasons. Either the court determined (1) that the transactions were not profitable or did not harm the Trust (as Denholm contends), (2) the evidence of profit was unduly remote from the breach (See *Uzyel, supra,* 188 Cal.App.4th 866), or (3) liability was calculated and encompassed in the court's broadly worded judgment that awarded over $239,000 in damages for Denholm's improper loans. A party who challenges a

25

court's ruling must summarize the evidence on that point, favorable and unfavorable, and address why they think the court got it wrong. Given the conclusionary nature of the briefing, including only a one-sided explanation of favorable evidence, we deem waived the issue of whether the court erred in refusing to award damages for the four transactions.

*D. Elder Abuse*

Welfare and Institutions Code section 15610.30, subdivision (a), provides in relevant part: "(a) 'Financial abuse' of an elder or dependent adult occurs when a person or entity does any of the following: [¶] "(1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both."

In addition to his role of trustee of the Trust, Denholm managed his Mother's financial affairs for over 20 years. It was undisputed he looked after her personal bank accounts and prepared her tax returns. The Trust provided Mother was the sole income beneficiary of the Trust from 1984 until her death on October 7, 2005. Article six stated, "The trustee shall pay the . . . net income of the trust estate equally [to the parents], so long as both shall live, and all the income to the survivor of them . . . ."

The Holts, on behalf of Mother, brought an action for financial elder abuse against Denholm under Welfare and Institutions Code section 15600. They alleged he wrongfully used the Trust for his own personal benefit, resulting in "a loss or depreciation in value of the . . . Trust . . . estate, lost profits, improper imprudent investments, lost income . . . and other damages." They concluded Denholm's misconduct deprived Mother of her property and he should have to pay punitive damages. If deemed liable for elder abuse, the Holts request an additional remedy pursuant to section 259, i.e., a ruling Denholm be deemed to have predeceased Mother, forfeiting his right to an inheritance.

26

The court determined Denholm did not commit financial elder abuse because Mother and her estate "suffered no damage, financial harm, or loss as a result of" Denholm's conduct. The court concluded, "The evidence presented fails to establish any factual basis for any assertion raised" in the sixth cause of action. It recited the elements of elder financial abuse and noted the claim required evidence Denholm took Mother's real or personal property for a wrongful use or with intent to defraud. The court reasoned, "No evidence was proffered that [Mother] was harmed. Harm must be evidenced by some negative impact upon [Mother]—not on [the Holts]—since [they] are stepping into [Mother's] shoes. The preponderance of the evidence shows [Mother] was deprived of nothing financial, and therefore, she suffered no harm within the meaning of [Welfare and Institutions Code section] 15610.30."

Additionally, the court ruled, "There was no evidence offered that would support [the conclusion] that any money was ever wrongfully taken from [Mother]. Nor was there any evidence that moneys not paid to [Mother] by the Trust were taken by Denholm. The purported income distributions merely remained in the Trust, and were held for [Mother's] benefit. The matter in which such money was treated was set forth in an analysis by [the Holts' expert, James] Skorheim in which he opined that the 'distributable net income' did not equate to the 'distributed income' to [Mother] for a period of five . . . years. Through cross-examination, . . . Skorheim admitted that he had not taken into consideration a check for $50,000 to [Mother] since he had not seen it before. In fact[,] he said he only calculated the differential from items give to him by [the Holts] and did no independent accumulation of [the] evidence on his own. Defendants' expert, Allan Whitman, testified that the two concepts, namely 'distributable net income' and 'distributed income' had nothing to do with each other. In . . . Whitman's analysis, he used a period of seven . . . years which encompassed the same 5-year period used by . . . Skorheim and his numbers were almost the same. When questioned on the stand, . . . Whitman stated that the outcome of the exercise was

27

relatively the same by chance.  He opined the two concepts were completely unrelated. Therefore, . . . Skorheim's opinion that [Mother] was harmed because 'distributable net income' and 'distributed income' are not the same is rejected by the court."

The court noted Clunies A., testified Mother was in a wheelchair and required 24-hour assisted living care for the last five years of her life because her vision was poor, not because she was suffering from dementia.  This assessment of mental capacity was relevant to the court's next conclusion that, "No party disputes that [Mother] consented to the transactions Denholm entered into on behalf of the Trust as trustee."  Such consent diffuses any notion of a wrongful taking.

Finally, the court rejected the Holts' contention Denholm's use of a tax deduction by the Trust for the Evergreen Midtown Plaza was evidence of financial elder abuse.  The court concluded the deduction benefited the Trust, and was also a benefit to Mother.  It stated, "Whitman provided a compelling analysis as to the advantages to [Mother] of the use of the entity tax deductions through the Trust.  The [c]ourt finds . . . Whitman to be credible and his opinions fair and reasonable.  The [c]ourt finds his opinions were buttressed by the testimony of [accountant] David Lazarus on both the tax deduction and the distributed income issue.  In short, [the Holts] proved no financial abuse by Denholm against [Mother]."

On appeal, the Holts assert this ruling was erroneous because there was evidence Denholm breached his fiduciary duty to the Trust.  They maintain Denholm used the Trust's monies for his own personal benefit that should have been paid as income to Mother.  Without citations to the record or supporting case authority, the Holts contend every dollar Denholm took "represents loss of distributable income to his mother and investment opportunity to the determinant of his mother . . . ."  In a footnote, again without providing supporting case authority, the Holts explain it does not matter whether Mother needed the income or not.

28

We conclude substantial evidence supports the trial court's determination Denholm did not financially harm his Mother. As stated, Welfare and Institutions Code section 15610.30 requires evidence of a wrongful taking from an elderly person (Mother), not the Trust. Mother's rights were limited as income beneficiary, lasting only for her lifetime. It is undisputed Denholm never took money directly from Mother or siphoned off her income distributions from the Trust. And the Holts do not dispute on appeal the court's finding Mother consented to Denholm's actions with the Trust. Nor do they attempt to refute the court's reliance on Whitman's testimony, and rejection of the Holts' expert's opinion, Mother personally suffered no financial loss. The court reasonably relied on Whitman's and Lazarus's testimony distributable net income and distributed income are not the same thing and any disparity between the two did not mean Mother was financially harmed. As Lazarus explained, all net income passes through the Trust and must be reported in the income beneficiaries' tax returns, however this sum is different from the cash distributed directly to Mother.

As an income beneficiary, Mother had the right to collect whatever cash she needed from the Trust during her lifetime. Two experts testified Denholm's conduct did not financially harm Mother, and this evidence amply supports the court's judgment on the financial elder abuse claim. We find no authority, and the Holts cite to none, holding an elder person collecting all the money she requires and desires from a trust during her lifetime can be called the victim of financial elder abuse.

E. Attorney Fee Award

The trial court awarded $479,164.25 for attorney fees to HGC and Waterpointe. In its order the court reasoned, "In [the Holts' fourth] cause of action for breach of fiduciary duty, paragraphs 72 through 84 of the [FAC], the [Holts] alleged in part that [HGC and Waterpointe] owed a fiduciary duty to the Trust arising out of its status as a co-member of the subject [LLC]. [The Holts] alleged that [the Trust's] funds represented a 'critical majority investment' of the LLC. [The Holts] alleged the

29

defendants, in structuring the LLC, sought to disadvantage the Trust by setting up the Trust to shoulder most of the risk in any investment by the LLC in order to dilute the Trust's interest in LLC ventures. [The Holts] sought attorney[] fees against HGC LLC, presumably on contractual grounds inasmuch as [the Holts] claimed the Trust was a member of the LLC. (Absent a contractual or statutory basis for attorney[] fees, a party is not entitled to such fees. The complaint does not reference any statutory basis for attorney[] fees.) [¶] Had [the Holts] been successful against the moving party at trial they could have plausibly obtained attorney[] fees under [section] 18.2 of [HGC's] [o]perating [a]greement as prevailing parties in connection with an action for enforcement of the agreement. Where the non-signatory claims the benefit of an attorney[] fees clause in a contract, the opposition is likewise entitled to such fees if the opposition prevails in the action. [Citations.] Thus, as prevailing parties in the instant suit, [HGC] is entitled to fees under Civil Code section 1717 and Code of Civil Procedure section 1021."

The Holts assert the court erred because they are not parties to the operating agreement and their causes of action were tort based and not "on a contract" within the meaning of Civil Code section 1717. We disagree.

*1. Standard of Review*

"'On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees . . . have been satisfied amounts to statutory construction and a question of law.'" (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175.)

*2. Rules Regarding Attorney Fees*

Code of Civil Procedure section 1021 essentially reverses the American rule that parties to litigation must bear their own fees and affords parties the opportunity to agree otherwise. Code of Civil Procedure section 1021 states, "Except

30

as attorney[] fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties; but parties to actions or proceedings are entitled to their costs, as hereinafter provided." "There is nothing in the statute that limits its application to contract actions alone. It is quite clear from the case law interpreting Code of Civil Procedure section 1021 that parties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between themselves, whether such litigation sounds in tort or in contract. [Citations.]" (*Xuereb v. Marcus & Millichap, Inc.* (1992) 3 Cal.App.4th 1338, 1341.)

Civil Code section 1717 has a more limited application to only actions brought "on a contract" and serves to make a one-sided attorney fees provision reciprocal to ensure "mutuality of remedy when the contract includes a provision for the recovery of attorney fees as costs." (*Topanga and Victory Partners v. Toghia* (2002) 103 Cal.App.4th 775, 780 (*Topanga*).) It provides in pertinent part, "In any action on a contract, where the contract specifically provides that attorney[] fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney[] fees in addition to other costs." (Civ. Code, § 1717, subd. (a).)

As aptly explained in *Topanga, supra,* 103 Cal.App.4th at page 780, "Only in an action on a contract does [Civil Code] section 1717 provide mutuality of remedy when the contract includes a provision for the recovery of attorney fees as costs. It is applied where an otherwise unilateral right to recover attorney fees is not reciprocal, ensuring mutuality of remedy so that attorney fees may be awarded to whichever contracting party prevails. It is also applied where a party is sued on a contract providing for an award of attorney fees to which he is not a party. 'To ensure mutuality of remedy in this situation, it has been consistently held that when a party litigant prevails in an

31

action on a contract by establishing that the contract is invalid, inapplicable, unenforceable, or nonexistent, [Civil Code] section 1717 permits that party's recovery of attorney fees whenever the opposing parties would have been entitled to attorney fees under the contract had they prevailed. [Citations]."

In addition, nonsignatories to contracts are sometimes entitled to attorney fees pursuant to Civil Code section 1717. For example, a nonsignatory who prevails in an action on the contract is entitled to attorney fees provided it would have been liable for fees had the other party prevailed. (*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129 [successful defense of contract action brought on alter-ego theory].) Conversely, on occasion attorney fees may be assessed against a nonsignatory who loses an action on the contract. (*Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101, 1111 (*Abdallah*) ["A defendant that has signed a contract providing for attorney fees is generally entitled to fees if it prevails against a nonsignatory plaintiff in an action on the contract"].) "[T]he courts have generally ruled that, if a prevailing signator would be entitled to fees against a nonprevailing nonsignator, then nonsignators in litigation on such contracts are both entitled to attorney fees if they prevail and obligated to pay attorney fees if another party prevails.' [Citation.]" (*Hyduke's Valley Motors v. Lobel Financial Corp.* (2010) 189 Cal.App.4th 430, 435.)

There are many factors to consider when evaluating whether a party has prevailed in an action "on the contract." (Civ. Code, § 1717.) "The [trial] court should consider the pleaded theories of recovery, the theories asserted and the evidence produced at trial, if any, and also any additional evidence submitted on the motion in order to identify the legal basis of the prevailing party's recovery. [Citations.]" (*Boyd v. Oscar Fisher Co*. (1989) 210 Cal.App.3d 368, 377.)

*3. Action Was "On the Contract"*

The Holts sued HGC and Waterpointe for aiding and abetting breach of fiduciary duty and fraud by concealment. They assert these causes of action are generally

32

considered tort claims precluding application of Civil Code section 1717. (Citing *Stout v. Turney* (1978) 22 Cal.3d 718, 730 [action for fraud arising out of contract is not action on contract]; *Exxess Electronixx v. Heger Realty Corp.* (1998) 64 Cal.App.4th 698, 708 [action for breach of fiduciary duty not an action on contract].) The Holts conclude attorney fees are not recoverable under Civil Code section 1717 because their action did not seek to enforce the terms of HGC's operating agreement. They add, "even if an action had been brought to enforce the terms of the [o]perating [a]greement . . . narrowly worded provisions that restrict the right to recover fees to 'enforce the terms of the agreement' do not permit an[] award of attorney fees on a tort claim. [Citations.] The claims against HGC were tort claims." They are wrong.

We appreciate, "'It is difficult to draw definitively from case law any general rule regarding what actions and causes of action will be deemed to be 'on a contract' for purposes of [Civil Code section] 1717.' [Citation.]" (*Hyduke's, supra,* 189 Cal.App.4th at p. 435.) However, based on the pleadings presented in this case, we agree with the trial court's conclusion the breach of fiduciary duty claim was "on a contract" containing an attorney fees provision. The mere fact the Holts did not plead a breach of contract cause of action is not dispositive. "'Whether an action is based on contract or tort depends upon the nature of the right sued upon, not the form of the pleading or relief demanded. If based on breach of promise it is contractual; if based on breach of a noncontractual duty it is tortious. [Citation.] If unclear the action will be considered based on contract rather than tort. [Citation.] [¶] In the final analysis we look to the pleading to determine the nature of plaintiff's claim.' [Citation.]" (*Kangarlou v. Progressive Title Co., Inc.* (2005) 128 Cal.App.4th 1174, 1178-1179 (*Kangarlou*) [because breach of fiduciary duty arose out of escrow agreement, [Civil Code] section 1717 entitled prevailing plaintiff to attorney fees].)

The fourth cause of action of the FAC alleged Waterpointe, HGC,

33

CALCO I, and CALCO Properties were liable for aiding and abetting breach of fiduciary duty. Before delving into the specific allegations, a brief review of the relationship between the various LLCs and basic LLC rules is helpful. Denholm, the sole owner of CALCO Properties, formed CALCO I to serve as the investor in HGC, which was formed to develop property in Irvine. Denholm structured the deal so that Denholm was a member of CALCO Properties, which was a member of CALCO I, which in turn was a member of HGC. Waterpointe, also a member of HGC, served as the managing member.

It is important to recognize the terms "member" and "managing member" are legal technical terms in the context of LLCs and a member's rights and responsibilities are generally defined by the operating agreement. Indeed, LLCs are a hybrid between a partnership and a corporation and are governed by the California Revised Uniform Limited Liability Company Act (Corp. Code, § 17701.01 et seq.). A LLC is formed upon the filing of articles of organization with the Secretary of State, and the formation between the members of an operating agreement. (Corp. Code, §§ 17701.10 & 17702.01.) As provided by the statutory scheme, the operating agreement governs many aspects of the company, including the "[r]elations among the members as members and between the members and the [LLC]." (Corp. Code, § 17701.10, subd. (a)(1).) The term "member" is a legal term in the context of LLCs. (Corp. Code, §§ 17701.02, subd. (p) & 17704.01.)

Corporations Code section 17704.01 describes what is required to become a member. If a LLC "is to have more than one member upon formation, those persons become members as agreed by the persons before the formation of the [LLC]." (Corp. Code, § 17704.01, subd. (b).) After formation, a person becomes a member as provided by the operating agreement, the result of a transaction, and with consent of all the members. (Corp. Code, § 17704.01, subd. (c)(1)-(3).) Corporations Code section 17704.09 delineates the fiduciary duties and other standards of conduct for members and managers of a LLC. The fiduciary duties of a manager to the LLC and

34

other members "shall only be modified in a written operating agreement with the informed consent of the members." (Corp. Code, § 17701.11, subd. (e).) In summary, the rules and regulations highlight the purpose and importance of a LLC's operating agreement in determining membership, duties, and rights of the members.

In apparent recognition of the statutory scheme, the Holts alleged in the fourth cause of action that a fiduciary duty owed to the Trust "and the [Holts] as beneficiaries" arose because the Trust "is a member" of CALCO I and HGC. They alleged CALCO I and CALCO Properties are essentially one and the same because CALCO I is in reality a "pass through vehicle" for CALCO Properties to invest the Trust's money into HGC.

Based on the premise the Trust is a member of CALCO I and HGC, the Holts alleged the Trust was "therefore owed a fiduciary duty by each [LLC] and its members." The Holts clarify all the members, managing members, and LLCs owed a fiduciary duty to the Trust, which would include Waterpointe (as a co-member and manager of HGC), HGC (co-members with CALCO I and Waterpointe), and CALCO I (as a co-member of HGC).

The Holts alleged these four LLCs breached their fiduciary duty in two distinct ways. First, they asserted the LLCs breached a fiduciary duty owed to the Trust by *creating* other LLCs to enter into real estate ventures with disadvantageous terms for the Trust. The Holts could have prevailed on their claim against CALCO Properties and CALCO I, owing a fiduciary duty as a co-member with the Trust in creating HGC and alleged inequitable terms of membership. As delineated in the complaint, the Trust provided 100 percent of HGC's financing, and in return received only a 60 percent equity share. The Holts' action claiming these disadvantages sought to enforce the fiduciary duties created by the member's operating agreement.

The second purported fiduciary duty arising from HGC's operating agreement related to the LLC's conduct. The Holts asserted the members and manager of

35

HGC diluted the Trust's equity share by making cash distributions to Denholm. As discussed earlier in this opinion, the managing member, Waterpointe, agreed to pay Denholm $60,000 from a construction loan and called it management fees. The operating agreement expressly provided Waterpointe owed the members of HGC a fiduciary duty of care. Indeed, paragraph 5.8.1 of the operating agreement specified the manager of the LLC, who was Waterpointe, owed a fiduciary duty to "the Company and the Members . . . ." If it was established the Trust was a member of HGC, it could seek to enforce the fiduciary obligations arising from HGC's operating agreements to the members.

The *Kangarlou* case is instructive. In that case, a home purchaser sought attorney fees under a provision in an escrow contract after prevailing on an action against the title company (the escrow holder) for breach of fiduciary duty. (*Kangarlou, supra,* 128 Cal.App.4th at p. 1177.) In awarding attorney fees the court recognized, "An act such as breach of fiduciary duty may be both a breach of contract and a tort. [Citation.] '[T]ort claims do not "enforce" a contract' and are not considered actions on a contract for purposes of [Civil Code] section 1717. [Citation.]" (*Kangarlou, supra,* 128 Cal.App.4th at p. 1178.) It reasoned, "'Whether an action is based on contract or tort depends upon the nature of the right sued upon, not the form of the pleading or relief demanded. If based on breach of promise it is contractual; if based on breach of a noncontractual duty it is tortious. [Citation.] If unclear the action will be considered based on contract rather than tort. [Citation.] [¶] In the final analysis we look to the pleading to determine the nature of plaintiff's claim.' [Citation.]" (*Id.* at pp. 1178-1179.) Examining the home purchaser's complaint, the court determined she made multiple claims but proceeded to trial on only breach of fiduciary duty based on the title company's duty to determine "'that a real estate broker was regularly licensed before delivering compensation, to communicate to the depositor facts learned concerning the escrow instructions or the broker's license, to exercise reasonable skill and diligence in carrying out the escrow instructions, and to comply strictly with the depositor's written

36

instructions concerning delivery of money or documents to third persons at the close of escrow.'" (*Id.* at p. 1179.)

The court considered each alleged breach separately to determine if the breach was based on a contractual or noncontractual duty. It concluded, "The duty of an escrow holder to obtain evidence that a real estate broker was regularly licensed before delivering compensation arises from Business and Professions Code section 10138. [The title company] assumed this duty only by entering the contract to execute the escrow for [the home purchaser] and the seller. Accordingly, the duty arose out of and is not outside the contract. [¶] The duty to communicate any facts learned about the broker's licenses arises only because of the duty to obtain such evidence. Since the duty to obtain such evidence is not outside the contract, the duty to communicate those findings also is not outside the contract. [¶] An escrow holder has a fiduciary duty to the escrow parties to comply strictly with the parties' instructions. [Citation.] The holder only assumes this duty by agreeing to execute the escrow. The obligation to exercise reasonable skill and diligence in carrying out the escrow instructions, and to comply strictly with the depositor's written instructions are within the duties undertaken in the contract. [¶] Because appellant prevailed in her suit based on the contract, she is entitled to fees." (*Kangarlou, supra,* 128 Cal.App.4th at p. 1179.)

Similarly in this case, the fiduciary obligation of a LLC's member to equitably create and structure other LLCs for real estate ventures, and to make equitable cash contributions are duties undertaken upon creation of the LLC's operating agreement and were not independent of it. A member's duties to other members are part of the promises made in forming the LLC. Consequently, a breach of these duties represented

37

broken promises made within the contractual relationship, by definition an action in contract. (See *Kangarlou, supra,* 128 Cal.App.4th at p. 1179.)[5]

As the trial court recognized, the gravamen of the Holts' action against Waterpointe and HGC was to *interpret* the agreement as including the Trust as a "member" and *enforce* the fiduciary duty obligations provided for by the agreement between members. The attorney fee clause contained in HGC's operating agreement broadly gave members of the LLC the right to recover fees "[i]f an action is commenced to enforce or interpret any provision hereof . . . ." The Holts did exactly that.

The Holts' arguments on appeal are largely belied by the record. First, they assert neither the Trust nor the beneficiaries claimed to be HGC's members. Not so. The fourth cause of action of the operative complaint plainly asserted the Trust "is a member of [d]efendants [CALCO I] and HGC, and is therefore owed a fiduciary duty by each [d]efendant [LLC] and its members." In addition, the complaint clarified the LLCs "breached their fiduciary duty to the [Trust] and the [p]laintiffs as beneficiaries." The record shows both the Trust and beneficiaries claimed to be members of the LLCs.

In addition to arguing the action was not brought to enforce the HGC operating agreement (an argument we have addressed and rejected above), the Holts assert they are not parties to the agreement and therefore cannot be held contractually liable. Not so. Attorney fees may be assessed against a nonsignatory who loses an action on the contract under Civil Code section 1717. (*Abdallah, supra,* 43 Cal.App.4th at p. 1111 ["A defendant that has signed a contract providing for attorney fees is generally entitled to fees if it prevails against a nonsignatory plaintiff in an action on the

---

5        We recognize the Holts also alleged the four LLCs aided and abetted Denholm in the breach of his fiduciary duty as trustee. We recognize these allegations are not based on contract and cannot serve as the basis for attorney fees under Civil Code section 1717. Our discussion addressed the Holts' allegation each LLC had a "distinct and separate fiduciary duty to the [Trust]." As stated, this purported independent fiduciary duty arose from the Trust's membership in the LLCs.

38

contract"].)  The Holts' and the Trust's status as nonsignatories is irrelevant, the only question is whether they would have been entitled to fees had they prevailed.  Any member of the LLCs seeking to interpret the operating agreements in their favor and to enforce a fiduciary duty owed by other members of the company would certainly be entitled to attorney fees under the broadly worded attorney fee provision in the agreement.  The members agreed the prevailing party would receive attorney fees "[i]f an action is commenced to enforce or interpret any provision hereof . . . ."

The Holts assert there is no equitable estoppel simply because the prayer in the FAC requested attorney fees.  We agree.  "The mere allegation in a complaint that the plaintiff is entitled to receive attorney fees does not provide a sufficient basis for awarding them to the opposing party if the plaintiff does not prevail."  (*Sessions Payroll Management, Inc. v. Noble Construction Co.* (2000) 84 Cal.App.4th 671, 681-682.)  Simply stated, the Holts are liable for attorney fees not because of the prayer for fees but because if they had prevailed, they would have been entitled as nonsignatories to seek attorney fees under Civil Code section 1717.

Finally, the Holts assert there is no basis to hold them individually liable for fees.  They claim they appeared in the action only in a representative capacity on behalf of the Trust.  The only authority they cite to support this claim is *Shadoan v. World Savings & Loan Assn.* (1990) 219 Cal.App.3d 97, 107 (*Shadoan*).  The case does not assist them.  In *Shadoan,* borrowers brought an action against a savings and loan association on behalf of themselves and others similarly situated, alleging a penalty provision was an unfair business practice.  (*Id.* at p. 101.)  The court held the court did not err in apportioning fees between the borrowers' private action for relief from their contract and the action for injunctive relief on behalf of others, because only the former action fell within the purview of Civil Code section 1717.  It concluded the action to enjoin an unfair business practice went far beyond enforcement of the contract and was therefore not "on the contract" as defined by Civil Code section 1717.  (*Shadoan, supra,*

39

219 Cal.App.3d at p. 108.)  In contrast, we have concluded the Holts' action for breach of fiduciary duty was on the contract.  The Holts have not brought a class action.  The caption of the FAC lists Clunies A. and Clunies E. as individuals.  The Holts alleged they were personally owed fiduciary duties under the agreement because they are the Trust's beneficiaries.  The Holts fail to provide any record citation or authority establishing they appeared in the action solely in a representative capacity.  Given the lack of supporting record citations and case authority, we deem this argument waived.

III

DENHOLM'S APPEAL

Denholm raises the following issues:  (1) the trial court's decision was based on erroneous statements of the law regarding the beneficiaries; (2) the court erred in refusing to allow parol evidence regarding the settlors' intention; (3) the court erred in refusing to allow evidence damages should be reduced to reflect the net value of damages to the Trust; (4) the statement of decision was inconsistent with the court's ruling and with the evidence of damages; and (5) there was no basis for the court to hold Denholm guilty of constructive fraud.  In addition, Denholm requests we take judicial notice of a minute order and petition for accounting filed in probate court.  The request is granted.  (Evid. Code, § 452, subd. (d).)

A.  *No Erroneous Statement of Law*

The court concluded, "Denholm [was] liable to the Trust because he engaged in self-dealing without the consent of the other trust beneficiary.  Specifically, Denholm borrowed money from the Trust at interest rates and repayment terms he set without the consent of the other beneficiary.  Further, he personally took an interest in and personally benefitted from investments of the Trust's assets without the consent of his co-beneficiary."  The court further determined, "Denholm had no authority [under the terms of the Trust] to borrow money from the Trust for his own benefit without the consent of Clunies A."  It noted an inherent conflict arises when a trustee acts as both the

40

debtor and creditor, and Denholm's loans constituted a breach of loyalty. In addition, the court ruled "Denholm . . . had no authority to take an interest in or personally gain from ventures involving the investment or use of trust assets without the approval of the other beneficiary." The court acknowledged a trustee will not be held liable if the beneficiaries consent to a trustee's self-dealing, but in this case, there was no evidence of consent. Relying on the testimony from Denholm, Clunies A., and her three children, the court held Denholm did not disclose to the beneficiaries he borrowed money from the Trust, and the beneficiaries did not consent to his self-dealing and conflict of interest transactions.

Denholm asserts the court's ruling contained a misstatement of the law. Namely, the court erroneously found Clunies A., was his co-beneficiary during the relevant time period of self-dealing. He explains Mother was the sole income and principal beneficiary of the Trust from November 1984 until her death in October 2005, and she was the only person entitled to object to his self-dealing. He adds there was evidence Mother consented to his self-dealing transactions.

The Holts assert this contention is being raised for the first time on appeal. Not so. Denholm raised this issue in his request for clarification of the amended final statement of decision. Denholm sought clarification of the court's finding "'Denholm had no authority to borrow money from the Trust for his own benefit without the consent of Clunies A. The Trust instrument does not permit loans by the Trustee to himself unless approved by the co-beneficiary.'" (Bold emphasis omitted.) He argued the evidence was uncontroverted that all the loans he made were at the time Mother was alive and the sole beneficiary, and no loans were made after her death when Clunies A. was a co-beneficiary. The Holts also addressed this issue in their "objection" to Denholm's request for clarification, arguing the scope of the trustee's duties extended beyond Mother and included future named beneficiaries, including Clunies A. The Holts argued misappropriations occurred after Mother's death. Denholm filed a response to the Holts'

41

objections, stating the argument is absurd and "shows no understanding of Trust law." The court issued a minute order denying Denholm's request for clarification.

In his opening brief, Denholm recites the statutory provision holding trustees are not liable for self-dealing if the beneficiary consents to the act or omission. (§ 16463.) He fails to mention section 16463 requires informed consent and there are several exceptions to the rule. Moreover, Denholm fails to explain *why* the court was wrong in deciding "the beneficiary" of an irrevocable trust, within the context of section 16463, should not include future income and principal beneficiaries (Clunies A. and her children). In his reply brief, Denholm suggests for the first time that because a trustee's duty to provide an accounting is limited to "current" beneficiaries (§ 16062), so too is the duty to obtain consent for a trustee's self-dealing transactions. We conclude he is wrong, and his argument is akin to comparing apples to oranges.

Under basic principles of trust administration, Denholm owed a duty of loyalty to the Trust's beneficiaries, and he must "administer the trust solely in the interest of the beneficiaries." (§ 16002.) A trustee must act in the highest good faith toward the beneficiaries. (*Estate of Keyston* (1951) 102 Cal.App.2d 223, disapproved on other grounds in *Estate of Schloss* (1961) 56 Cal 2d 248, 256.)

Section 16004 discusses conflicts of interest. It provides a trustee may not engage in any transaction (1) with trust property for the trustee's own profit or for a purpose unconnected with the trust, or (2) "in which the trustee has an interest adverse to the beneficiary." Self-dealing is a violation of the duty of loyalty regardless of the trustee's good faith of the trustee. Self-dealing occurs when the trustee uses trust assets to potentially benefit himself or herself, even if there is no actual loss to the trust. There is no dispute Denholm engaged in self-dealing with the Trust's assets.

Not all conflicts result in trustee liability though. A trustee can cure a conflict with the consent of the settlor of a revocable trust (§ 16462). A trustee may enter a transaction from which he or she could potentially profit if the trust or court authorizes

42

it, or if the beneficiaries give informed consent to it under section 16463. However, consent of the settlor or beneficiaries requires full disclosure of all the material facts and circumstances surrounding a particular transaction. (§ 16463, subd. (b)(2).) "The mere fact . . . that the beneficiary does not object to a deviation from the terms of the trust is not consent to such deviation." (Rest.2d Trusts, § 216, com. a, p. 499.) Consent cannot be induced by the trustee's improper conduct. (§ 16463, subd. (b)(3).) Consent to the transaction will be effective only if the transaction is otherwise fair and reasonable. (§ 16463, subd. (c); see also § 16501, subd. (d) [listing 10 conflicts of interest and acts of self-dealing that cannot be cured by consent].) "Obviously, the disclosure and consents should be in writing. If the trustee is being represented by family counsel, the attorney should tell the beneficiaries that he or she is representing the trustee and that they may want independent counsel." (1 Cal. Trust Administration (Cont.Ed.Bar 2nd ed. 2011) § 2.39, p. 56 (hereafter CEB Trust Administration).)

If the trustee has already entered into a self-dealing transaction, the trustee may obtain the beneficiaries' release or affirmation of the transaction under section 16465. However to be effective, the release or affirmation must be obtained the same way consent is obtained.

Section 16463 does not define or limit which trust beneficiaries must consent. It simply provides, "a beneficiary may not hold the trustee liable . . . if the beneficiary consented to the act or omission before or at the time of the act or omission." (§ 16463, subd. (a).) Although we found no case authority addressing this issue, we found several learned treatises on trust law instructive. It appears to be universally accepted that "all beneficiaries" must consent before a trustee undertakes a questionable transaction. (CEB Trust Administration, *supra*, § 2.40, p. 57.) The Restatement Second of Trusts, section 216, comment g, pages 501-502, explains, "If there are several beneficiaries, whether *concurrent or successive*, the consent of one of them to a deviation from the terms of the trust does not preclude the other beneficiaries from holding the

43

trustee liable for breach of trust so far as their interests are affected. [¶] Thus, the consent of one of two co-beneficiaries to a breach of trust does not preclude the other beneficiary from holding the trustee liable for the breach of trust." (Italics added.) It provides the following example, "Thus, if a trust is created for one beneficiary for life and another in remainder and the life beneficiary consents to an investment which is not a proper trust investment and the remainderman does not consent, and a loss occurs, the trustee is under a duty to the remainderman to dispose of the improper investment and to make good the loss by making payment into the trust of the amount of the loss, but the trustee is entitled to take and retain for himself during the life of the life beneficiary the income received on the amount of the loss so repaid." (Rest.2d Trusts, § 216, com. g, p. 502.)

CEB Trust Administration cautions the beneficiary consent solution may not be feasible with irrevocable trusts. "As a practical matter, all beneficiaries of an irrevocable trust should consent. [Citations.] For such consent, all beneficiaries must have full capacity to contract and, therefore, cannot be minors. [Citations.] A conservator and the court may give consent for a beneficiary who is incapacitated under the doctrine of substituted judgment. [Citations.] Clearly, *because most irrevocable trusts have unascertainable, contingent, or unborn beneficiaries whose consent is impossible to obtain, the beneficiary-consent solution is rarely a feasible means of curing a conflict of interest.*" (CEB Trust Administration, *supra*, § 2.40, p 57, italics added; see also Rest.2d Trusts, § 216, com. j, p. 504 ["If the beneficiary is an infant or insane or otherwise under an incapacity to contract, his consent to a deviation by the trustee from the terms of the trust does not preclude him from holding the trustee liable for breach of trust"].) Applying this well-reasoned body of authority, we hold the trial court was not mistaken in deciding Denholm was liable because he failed to obtain the consent of all the Trust's beneficiaries before self-dealing.

44

Denholm's discussion of a trustee's duty to produce an accounting to only current beneficiaries (§ 16062) is inapt. Trustee's have a ministerial-type duty to furnish information to "each beneficiary to whom income or principal is required or authorized." However, there is no similar duty to obtain consent for conflicts. There is only a duty of loyalty, which broadly applies to current and future beneficiaries. (§ 16002.) Consent is merely one solution to avoid liability for breaching the duty of loyalty. And because acts of self-dealing implicate the financial interests of both current and future beneficiaries of an irrevocable trust, consent must be obtained from all beneficiaries.

B. *Parol Evidence Issue*

Denholm asserts he should not be held liable because his parents intended to give him absolute discretion in managing the Trust. The Trust plainly stated, "The Trustee is authorized, in his absolute discretion, without leave, license, authority, or approval of any [c]ourt whatsoever, including any [c]ourt having jurisdiction of this trust: [¶] (a) to acquire and make such purchases, sales or exchanges at such times, in such manner and upon such terms as he shall determine [plus 17 other categories of permissible activities]." In addition, the Trust provided the trustee "shall not be held liable for any loss by reason of any accident, mistake, or error of judgment made by him in good faith in the execution of this trust."

Denholm argues the court would not allow him to introduce extrinsic evidence of his conversations with his parents, the drafting attorney, and the family accountant, regarding his parents' intention to give him "absolute discretion" as trustee. He states the parol evidence would prove the settlors in using the words "absolute discretion" intended to give him "maximum flexibility" and the "broadest possible powers" in administering the Trust "as he saw fit."

The court excluded the testimony based on its determination the term "absolute discretion" was unambiguous. The court determined if the jury determined Denholm was liable, the court would then hear testimony about his subjective belief he

45

was acting in good faith. It stated, "[There is no] ambiguity in the Trust document, so there's no extrinsic evidence the court would allow on interpretation of the trust document. . . . [¶] . . . [A]nd further, the issue of . . . Denholm's good faith is not a jury issue. We can hear it outside the presence of the jury or at the end of the case if there's a finding of liability since it's really kind of an affirmative defense. [¶] So the Trust says what it is. There's really no reason to have extrinsic evidence." The court was right.

When construing the terms of a trust, the court must give effect to the settlors' intent. "We do this by looking at the language used, interpreting words in their ordinary and grammatical sense, unless a different interpretation can be clearly ascertained. [Citation.]" (*Huscher v. Wells Fargo Bank* (2004) 121 Cal.App.4th 956, 972.) Additionally, "It is now well settled that no matter how clear and unambiguous language may appear to the reader, extrinsic evidence is admissible for the purpose of ascertaining what was meant by the person using the words in question. [Citations.] The extrinsic evidence, however, may not show that what was meant by the words used was something to which, under all of the circumstances, the words are not reasonably susceptible." (*Levy v. Crocker-Citizens Nat. Bank* (1971) 14 Cal.App.3d 102, 104 (*Levy*).) Because of that limitation, we conclude the trial court did not error in refusing to admit the evidence.

It is generally understood a grant of "absolute discretion" will waive the strict requirements of the prudent investment rule and authorize the trustee to "to speculate, concentrate, buy and sell for appreciation, assume large risks." (*Coberly v. Superior Court* (1965) 231 Cal.App.2d 685, 689 (*Coberly*).) On appeal, Denholm asserts he was advised by his parents, the drafting attorney, and the accountant the Trust was drafted to give him the "broadest possible powers" and "maximum flexibility." The phrase "absolute discretion" is absolutely consistent with this interpretation of the settlors' intent. Extrinsic evidence was not necessary for ascertaining the meaning already legally attributable to the words "absolute discretion."

46

To prevail on the theory the Trust expressly authorized Denholm's misconduct, Denholm would need extrinsic evidence that in granting "absolute discretion" the settlors intended to confer *much more* than broad powers and flexibility. Denholm would have to supply evidence the settlors intended for him to engage in self-dealing and encouraged him to breach his fiduciary duty and repeatedly violate his fundamental duty of loyalty to the Trust and beneficiaries.

"[E]ven a trustee with 'absolute discretion' may not 'neglect the trust or abdicate its judgment,' [citation] or show a 'reckless indifference' to the interests of the beneficiary. [Citation.]" (*Estate of Collins* (1977) 72 Cal.App.3d 663, 672.) It is well settled, "A grant of absolute discretion to a trustee to administer assets does not mean it can do as it pleases, but rather that the grantor has waived the requirement that the conduct of the trustee at all times satisfy the standard of judgment and care exercised by a reasonable, prudent man." (*Coberly, supra,* 231 Cal.App.2d at p. 689.) "The trustee is still required to avoid arbitrary action and to use its best judgment." (*Ibid.*)

On appeal, Denholm does not suggest the omitted extrinsic evidence would have proven anything more than the settlors' intent to confer absolute discretion as the term is commonly understood. And to the extent there is evidence showing the settlors intended for him to do as he please, extrinsic evidence "may not show that what was meant by the words used was something to which, under all of the circumstances, the words are not reasonably susceptible." (*Levy, supra,* 14 Cal.App.3d at p. 104.) It constrains logic to interpret the phase "absolute discretion" to really mean reckless indifference to the interests of the beneficiaries.

C. *Calculation of Damages*

Denholm maintains the court erred in refusing to allow evidence that would show the net value damages to the trust. Specifically, he sought to introduce evidence showing that if the Trust was harmed, the damages were "greatly reduced by the deals in which the Trust obtained significant profits." Simply stated, Denholm contends the bad

deals should be offset by the good deals. He also attempted to introduce evidence the Holts "thwarted" his efforts to ameliorate losses to the Trust. We find no error.

As explained in Bogert's treatise on trust law, "Under traditional analysis, a trustee who incurred liability by reason of a breach of a duty regarding investments could not reduce that liability by proving that he made a profit for the trust by other legal or illegal conduct in the trust administration. All profits made by the trustee in carrying out the trust belonged to the beneficiary. . . . [¶] Thus if T as trustee purchased at different times two separate unlawful investments, the first a bond on which the trust incurred a loss of $500 and the second shares of stock which were sold at a profit of $500, the trustee wasn't relieved of liability for loss on the bond investment by showing a gain of an equal amount on the unlawful stock investment. The trustee was liable for the $500 lost on the bond and the trust estate got the advantage of the $500 gained on the stock transaction." (Bogert, the Law of Trusts and Trustees (3d ed. 2013) § 708, fn. omitted (hereafter Bogert).)

"No question arose as to the applicability of this rule when the profits and losses were incurred in separate and distinct transactions in which the trustee engaged, whether they were all non-legal or partly legal and partly non-legal. But a different situation arose if a trustee violated investment obligations by means of a single act which to some extent produced losses and in other ways resulted in gains. For example, suppose a trustee violated the trust by purchasing at one time and from the same seller a block of speculative stock, and later at various times sold the stock, in some cases at a loss and in other instances at a gain. Or the breach might have consisted of the purchase of a tract of land, a part of which was sold at a loss, but that oil was discovered on the remainder of the land later and this enabled the trustee to sell the rest of the land at a greatly advanced price, so that the whole transaction was highly advantageous to the beneficiaries. The beneficiary usually was required to choose between repudiating the entire transaction and treating it as unlawful, or on the other hand electing to treat it as

48

valid as a whole; a beneficiary could not disaffirm the act of the trustee in part and treat it as valid in part. Furthermore, if the beneficiary elected to affirm the transaction, the damages flowing from the breach were based on the net effect of the operation. [¶] In applying this rule, however, the courts were careful to define a single, separate and distinct breach in realistic and strict terms, and not to extend the doctrine to two or more acts of administration which were different because they were separated in time, did not relate to the same trust property or were concerned with two or more investment duties. Thus if a trustee had several non-legal items in the trust portfolio and had a duty to sell each, but retained them for an unreasonable time and then sold them at various dates, in some cases at a loss and in others at a gain, treating these transactions as one distinct breach, seems clearly unreasonable unless all the non-legals were originally obtained as the result of one transaction and at the same time. Unfortunately, the discussion in the Second Restatement of Trusts as to what constituted a 'distinct' breach of trust was rather vague and tended to extend the rule for the benefit of the trustee to some doubtful cases." (Bogert, *supra,* § 708, fns. omitted.)

The Restatement Third of Trusts has two sections devoted to the topic of offsetting profit against loss. Section 101 of the Restatement Third of Trusts provides, "The amount of a trustee's liability for breach of trust may not be reduced by a profit resulting from other misconduct unless the acts of misconduct causing the loss and the profit constitute a single breach." The comments to this section explain, "If a trustee is liable for a loss caused by a breach of trust, the amount of the liability is not reduced by a profit resulting from actions of the trustee that do not involve a breach of trust. The rule of this [s]ection applies only where the trust estate has experienced a profit as well as a loss from *improper* administration." (Rest.3d Trusts, § 101, com. a, p. 78.) "The rule of this [s]ection balances fairness to the trustee and regard for the interests and entitlements of the beneficiaries. Whether or not there is a breach of trust, the profits for which the trustee is accountable belong to the trust and its beneficiaries [citation]. Moreover, the

49

law is well settled that profits arising from *proper* administration do not reduce a trustee's liability for breach of trust; it would be ironic to permit a profit from improper administration to be offset against the trustee's liability.  Indeed, a rule that always allowed such a profit to offset a loss would tend to place undue emphasis on the timing of accountings and reports, and even on whether profitable conduct was a breach of trust, and would tend to encourage multiple breaches of trust.  For example, a trustee whose misconduct has caused a loss might take improper risks in pursuit of offsetting profit." (*Ibid.*)

Section 101 of the Restatement Third of Trusts discusses how to determine whether multiple acts of misconduct should be considered a single breach.  "No bright-line rule can be offered to determine whether misconduct resulting in a profit and misconduct resulting in a loss should be treated as constituting a single breach.  The following are illustrative of factors to be weighed to determine whether the misconduct should be considered to be a single breach for purposes of this [s]ection:  [¶]  (1) Whether the improper acts are the result of a single strategy or policy, a single decision or judgment, or a single set of interrelated decisions;  [¶]  (2) The amount of time between the instances of misconduct and whether the trustee was aware of the earlier misconduct and its resulting loss or profit;  [¶]  (3) Whether the trustee intended to commit a breach of trust or knew the misconduct was a breach of trust; and  [¶]  (4) Whether the profit and loss can be offset without inequitable consequences, for example to beneficiaries having different beneficial interests in the trust. [¶]  Although factor (1) is likely to be of particular significance, no definite rules can be stated with respect to the relative weight to be given to various factors; and no single factor or combination of factors is necessarily determinative of whether offset is appropriate." (Rest.3d Trusts, § 101, com. c, pp. 79-80.)   These same factors are listed in the Restatement Third of Trusts, section 213, within the context of the prudent investor rule.

Courts determining whether there is a single or multiple breaches balance these factors in different ways depending on the unique facts of each case. For example, the Restatement Second of Trusts, section 101, comment c, found *Ramsey v. Boatmen's First Nat. Bank of Kansas City, N.A.* (Mo. Ct.App. 1996) 914 S.W.2d 384, 389-390 (*Ramsey*), was instructive. In that case, the court recognized no one factor was determinative, but "[w]hen the breaches of trust relate to different parts of the trust property, they are more likely to be distinct than where the breaches relate to the same property or its product. [Citation.] . . . In the [*Estate of Bartlett* (Okla. 1984) 680 P.2d 369, 375] the trustee had invested trust property improperly. Upon sale of the improper investment he made a gain and reinvested the proceeds which later resulted in a loss. This was a related investment allowing the loss to be offset by the previous gain. [Citation.]" (*Ramsey, supra,* 914 S.W.2d at p. 389.)

The *Ramsey* court reasoned that in its case, "seven of the twelve investments in limited partnerships and the loans to . . . Campbell were not successive dealings with the same property but were different parts of the trust property being placed in separate investments. The different investments occurred over [15] years. Although Boatmen relies on the fact that each breach was due to Boatmen's policy of following . . . Ramsey's directions, this is not determinative. In balancing the respective factors of this case, each of the seven investments in limited partnerships and the loans to . . . Campbell were separate and distinct. Investments of trust property were made in seven separate limited partnerships, and the loans to . . . Campbell were made at different times. These investments were not related investments for the purpose of allowing offset." (*Ramsey, supra,* 914 S.W.2d at p. 390.)

Relying on *Uzyel, supra,* 188 Cal.App.4th 866, Denholm argues the court erred in refusing to hold the breaches were related. In *Uzyel*, there were several issues relating to the trustee's liability for breach of trust. (*Id.* at p. 878.) Among other things, the trustee breached his fiduciary duty of prudent investing by failing to diversify the

51

trust's assets by not selling Qualcomm stock or taking any measures to protect against a loss. (*Id.* at p. 912.) The trial court concluded the plaintiffs were entitled to "$6,930,400 on this claim, calculated as the difference between the amount the trust would have received if [the trustee] had sold the 80,000 shares on January 5, 2000, and the value of the shares on September 18, 2000, when [the trustee] turned over the shares to [plaintiffs]." (*Id.* at pp. 912-913.)

The trustee in the *Uzyel* case argued the trust realized a significant gain on the shares based on their original purchase price and or value when the trust took possession and this gain should offset any liability for loss. The court disagreed concluding an investment loss should not be offset against a profit resulting from a separate and distinct breach of trust. (*Uzyel, supra,* 188 Cal.App.4th at p. 914, citing Rest.3d Trusts, § 213, coms. d & e, pp. 175 & 177.) The court stated the purchase of the stock in 1999 was closely related to the trustee's failure to diversify the trust assets in 2000, but there were "other circumstances" supporting the conclusion the "breach of trust occurring in January 2000 and thereafter was separate and distinct from any prior breach of trust. The trial court found that [the trustee] breached his duty of prudent investing not only by failing to diversify the trust's assets, but also by failing to take any measures to protect the principal at any time during a substantial decline in value beginning in January 2000. Despite the dramatic increase in the aggregate value of the shares from approximately $2 million . . . in April 1999 to more than $14 million as of the market closing on January 3, 2000, [the trustee] failed to take any measures to protect the principal from price declines. The court found that [the trustee] was a skilled investor with the knowledge to employ measures such as a collar, a put option, a stop-loss order, or other measures to protect against a price decline. . . . [¶] We believe that [the trustee's] awareness of the dramatic increase in the value of the stock from April 1999 to January 2000 distinguishes his failure to employ any of the means available to him to protect the investment in January 2000 or thereafter from his prior failure to diversify the

52

trust's assets. Considering the factors set forth above, we conclude that the breach of trust occurring in January 2000 and thereafter was separate and distinct from any prior breach of trust so as to justify holding him liable for the depreciation in value of the trust assets resulting from the later breach." (*Uzyel, supra,* 188 Cal.App.4th at pp. 915-916.) This case does not assist Denholm.

The trial court in the case before us ruled, "The court finds that each alleged breach of trust is separate and distinct." It explained, "I think the evidence so far is that each breach could stand on its own, and even though there was some sort of generalized plan to, quote, grow the Trust, end quote, [there] does not appear from the outset of that plan . . . [a] specific vision for what the investments would be. I think . . . the testimony is . . . even from . . . Denholm, is that he would pursue opportunities as they presented themselves. So there wasn't really any circumstances where one investment was interrelated to any other investments. Each rose or sank on their own merits." The court acknowledged Denholm believed he was directed to "grow the trust" but there did "not appear to be any coordination between" investments, "they were just separate opportunities that . . . Denholm pursued as the opportunities arose."

It cannot be said the court abused its discretion. Denholm was not a naive trustee following a portfolio investment plan based on the advice of a financial investor. Over a 10-year period, he raided the Trust to form multiple LLCs, invest in business ventures for personal profit, and make personal loans to himself. Different parts of the Trust were placed in separate investments. This is not a case where one specific sum of money was repeatedly reinvested and transmuted from cash to real estate to stocks and back to cash. Denholm may have been honestly operating under a general belief he was growing the Trust, but his "investment decisions" using the Trust's funds were not coordinated.

As aptly stated by the *Uzyel* court, "The remedy for breach of trust should be adapted 'to fit the nature and gravity of the breach and the consequences to the

53

beneficiaries and trustee.' [Citation.] The goals of the remedy are not only to compensate the beneficiaries for their loss, but also to deter the trustee in question and other trustees from committing similar acts. [Citation.] Particularly with respect to the duty of loyalty, 'the principal object of the administration of the rule is preventative, to make the disobedience of the trustee to the rule so prejudicial to him that he and all other trustees will be induced to avoid disloyal transactions in the future.' [Citation.]" (*Uzyel, supra,* 188 Cal.App.4th at p. 907.) Substantial evidence supports the trial court's remedy for Denholm's wrongdoing.

Denholm raises one additional argument relating to the court's calculation of damages. Denholm complains the court erred in excluding evidence proving the Holts thwarted the Trust's ability to protect itself from further damages. He asserts counsel "made repeated efforts to introduce facts regarding [the Holts'] misconduct regarding the investments in [CALCO] II, CABOCO and Topaz, and each time the court excluded the testimony." He misrepresents the record and the basis for the court's rulings.

Denholm supplies three record references to support this argument. The first reference relates to events occurring during the trial on May 18, 2010. Denholm was questioned about his involvement with Topaz. According to the FAC, Topaz was formed in March 2006 to develop real property located at 115 Topaz Avenue in Balboa Island, California. The property was acquired for nearly $2 million as part of a tax deferred exchange. Denholm caused the Trust to loan $240,000 to Topaz. He also borrowed $45,000 from his father's estate. It was alleged that in April 2006, Denholm took $1,477,104 from Topaz's construction loan and $45,000 from his father's estate to purchase a home in Aspen, Colorado.

Denholm testified the Topaz deal was not ongoing. The property had been sold in January 2008, after he resigned as trustee. When Denholm attempted to say the Holts interfered with the sale by making inquiries through the broker, the court sustained counsel's hearsay objections. Denholm's counsel asked if the broker and the buyer knew

54

about the Holts' lawsuit. Opposing counsel again objected on the grounds of hearsay and relevancy. Denholm's counsel explained the evidence was relevant because it showed Topaz did not generate as much money as it could have. Counsel stated the Holts had a pattern of interference "in these deals and a failure to mitigate their damages."

The court asked if Denholm filed a cross-action against the Holts or alleged an affirmative defense of contributory negligence. Denholm's counsel replied he was asserting the theory of unclean hands, which would preclude the Holts from holding Denholm liable for the damage they helped cause. The court stated, "The problem I have is the way the lawsuit is structured. . . . [D]amages will be computed as damages to the Trust. So now you're asserting that misconduct . . . or negligence or some other conduct by [two other] beneficiar[ies], . . . adversely affect[ed] the trust." The court reasoned it "seemed inequitable though to assess any alleged misconduct against the Trust" and "the Trust is the one that's going to suffer by mitigated damage." It added, "If there's no cross-action and no affirmative defense of mitigation of damage, which I'm not sure how you would assert – I've never heard it asserted against the Trust because of the failure of the beneficiary to mitigate where the damages are sought to the Trust. Unclean hands usually arises in the context of where the parties are in pari delecto and I don't really see that."

The Holts' counsel argued, "Filing of a lawsuit cannot be used . . . as a basis for a claim of mitigation of damages[,] contributory negligence, or anything like that. The lawsuit filing is protected. All [Denholm's] arguing about is the Holts sued, and what was the option, don't sue? [¶] I mean the point is that this is a protected action by the Holts and there's not a single shred of evidence that has been offered through him that they've engaged in any misconduct whatsoever, and Civil Code section 47 protects the filing of a lawsuit itself. [¶] We went through this, I believe, as a motion in limine at the very beginning of this case when we were attempting to bring it up, and as I recall the original ruling by the court was without prejudice but . . . the position was taken that

55

there's no basis for saying the lawsuit itself can be used in any way to claim there should have been some mitigation of damages or whether it constitutes unclean hands or any type of equitable defense."

The court noted the original question was whether the purchasers of Topaz were informed of the lawsuit "but then the offer of proof . . . went broader." The court ruled the objection to the question was sustained because the lawsuit cannot be the basis for a set off claim, mitigation, or negligence.

Denholm's counsel then asked if any concessions were made to Topaz's buyers. The Holts' counsel objected the concessions would be irrelevant. The court asked for an offer of proof. Counsel replied, "I think he had to reduce the price: I think he had to [offer] them some other terms that affected the Trust." The court asked how counsel planned to connect that evidence to conduct by the Holts. Counsel stated, "I'm sure I can bring in another witness to say that." The Holts' counsel objected, stating it was again a lawsuit related issue and therefore irrelevant. The court asked if there was conduct other than the lawsuit that would have impacted a sales price, and what was it? Counsel said, "I'm trying to get to that." The court repeated, "I'm asking for an offer of proof. I presume you know where you're going, so I presume that the witness already knows the answer. So I'm just asking you to share it with us." Counsel replied, "I believe there were threats that they were getting involved in a transaction where they had exposure themselves." The court asked, "How is this witness going to establish those facts?" Counsel stated, "I don't know. I thought he would. I could tell of the conversations he had with . . . Abrams and the buyer and what he knew." The court stated it would sustain the objection "based upon that offer of proof." It added, "I'm not saying you can't get into it later. I just don't know and plaintiff ought – or parties should brief the court."

Based on the above exchange, it does not appear the court refused to consider testimony regarding the Holts' misconduct with respect to Topaz. Based on the

discussion at trial, the parties understood the trial court previously ruled the Holts' action of filing a lawsuit cannot be used as evidence they interfered with or contributed to damages suffered by the Trust.[6] The court indicated it was open to hearing evidence of other misconduct and requested an offer of proof. The court then determined the offer of proof was insufficient and sustained the objection on that basis. Contrary to Denholm's contention, the court did not rule evidence of other misconduct was inadmissible. Denholm offers no argument suggesting the court was wrong and his offer of proof was sufficient. Consequently, we find no error.

Denholm's second record reference also fails to support his contention on appeal. He points to the reporter's transcript taken of the trial on June 17, 2010, during Clunies A.'s testimony. Clunies A. admitted she wrote e-mails to the interim trustee, San Pasqual, stating she and her children would not agree to any sort of hold harmless or anything else concerning CABOCO and would not cooperate in any way. At the time, San Pasqual was attempting to refinance property owned by CABOCO. Denholm's counsel sought to admit a copy of one of these e-mails (exhibit No. 4455) as evidence the Holts interfered with this investment, and although they were not the reason for its failure, their interference aggravated the loss. The Holts' counsel objected on the grounds the evidence was irrelevant.

The court sustained the objection, stating, "If you're suing for some kind of an offset or for negligence[] that would have to have been pled. I don't believe it's been pled. There's been no cross-action and you haven't really identified for the court any particular affirmative defense. And so negating whether there was lost profit or trying to prove there was lost profit is not relevant to these proceedings."

---

6        Denholm fails to provide us with a record reference to the motion in limine or the court's ruling. The motion in limine is not listed in the record's table of contents. Given that the appellant's appendix in this appeal is over 5,000 pages, and the reporter's transcript is over 7,000 pages, we did not search the record for it. And in any event, the court's prior ruling does not appear to be disputed.

When Denholm's counsel replied he was proceeding under a theory of unclean hands, the court stated, "Well, it's usually in the context of in pari delicto conduct, and I haven't seen any of that here." Counsel replied, "Okay." The court added, "And there's nothing illegal about the contract, so it's not one of those situations where there's an attempt to enforce an illegal contract like gambling debts or something. So I'll sustain the objection." The court asked counsel if he wanted to "make a better record" and counsel declined.

"The venerable doctrine of unclean hands arises from the maxim that one who comes to court seeking equity must come with clean hands. [Citation.] 'The doctrine demands that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim.' [Citation.] [¶] 'The unclean hands doctrine protects judicial integrity and promotes justice. It protects judicial integrity because allowing a plaintiff with unclean hands to recover in an action creates doubts as to the justice provided by the judicial system. Thus, precluding recovery to the unclean plaintiff protects the court's, rather than the opposing parties, interests. [Citations.] The doctrine promotes justice by making a plaintiff answer for his own misconduct in the action. It prevents "a wrongdoer from enjoying the fruits of his transgression." [Citations.]' [Citation.] [¶] 'The misconduct that brings the unclean hands doctrine into play must relate directly to the cause at issue . . . . The misconduct must ""prejudicially affect . . . the rights of the person against whom the relief is sought so that it would be inequitable to grant such relief."'" [Citation.]' [Citation.]" (*Jay Bharat Developers, Inc. v. Minidis* (2008) 167 Cal.App.4th 437, 445 (*Jay Bharat Developers*).)

"Courts have 'gleaned a three-pronged test to determine the effect to be given to the plaintiff's unclean hands conduct. Whether the particular misconduct is a bar to the alleged claim for relief depends on (1) analogous case law, (2) the nature of the

58

misconduct, and (3) the relationship of the misconduct to the claimed injuries. [Citations.]' [Citation.]" (*Jay Bharat Developers, supra,* 167 Cal.App.4th at pp. 445-446.)

Denholm sought to avoid liability for his own wrongdoing (breach of fiduciary duty to the Trust) on the grounds the Holts had unclean hands and contributed to the losses suffered by the Trust in the CABOCO deal. The court recognized the doctrine of unclean hands would not apply because regardless of whether the Holts acted wrongfully, the action was brought to remedy an injury to the Trust and the Trust did not have unclean hands. As aptly stated by the trial court, "the Trust is the one that's going to suffer by mitigated damage" under the theory some of the other beneficiaries had unclean hands. Denholm fails to provide us with any analogous case law holding unclean hands can be asserted against the Trust because of the failure of a beneficiary to mitigate damages sought by the Trust.

The court properly recognized the issue of a plaintiff's unclean hands may arise in the context of illegal contracts, where the parties are in pari delicto. "The law may lend its assistance to one of the parties who, through not wholly innocent, is either actually or in the eyes of the law not in pari delicto, i.e., not in equal wrong with the other." (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 438, p. 478, italics omitted.) The degree of wrongfulness is "material only where the contract is *malum prohibitum* [meaning prohibited by statute]; where it is *malum in se* [meaning wrong in itself or against good morals (murder, burglary etc.)], the decisions indicate that the court will not consider the relative guilt of the parties." (*Ibid.*) However, this body of case law is inapt because Denholm did not suggest below or on appeal that CABOCO transaction was illegal. Moreover, in this action it is the Trust seeking relief, and there was no evidence it was guilty of improper conduct with respect to CABOCO.

The third record reference is to the appellant's appendix. It is the only record reference relating to CALCO II. At the close of trial, on July 20, 2010, Denholm

59

filed a bench brief regarding "causal connection." In the brief, Denholm argued the Holts took certain actions after filing the lawsuit that "caused the Trust to suffer damage . . . . In short, in at least two deals (specifically, CALCO II and CABOCO), [the Holts'] intervening conduct constituted a superseding cause of the damage." Denholm argued the Holts were "barred from recovering assets for the Trust based upon the equitable doctrine of unclean hands" regarding these two transactions. The brief contains a lengthy description of what occurred with respect to the CALCO II and CABOCO transactions and the Holts' purported wrongdoing. He attached several supporting documents as exhibits.

However, this record reference does not support Denholm's argument on appeal that the court "repeatedly sustained [the Holts'] objections to evidence." Nor does it support his argument counsel "made repeated efforts to introduce facts regarding [the Holts'] misconduct and on each occasion the trial court excluded testimony." Denholm does not suggest the Holts objected to the bench brief or the supporting documents. There is no evidence the court refused to consider the information in the bench brief. Indeed, Denholm fails to explain what, if anything, happened after he filed the bench brief. He does not direct us to a court ruling suggesting the court excluded the evidence. We find no error.

*D. The Statement of Decision*

Denholm filed a motion to change or modify the statement of decision prepared by the Holts under Code of Civil Procedure section 662. He does not provide this court with a supporting record reference. In any event, Denholm maintains his motion should have been granted based on four inconsistencies. First, he asserts there was inconsistency between the court's ruling and the statement of decision prepared by the Holts relating to the cause of action for fraud by concealment. The other three "inconsistencies" sound like insufficiency of the evidence arguments. For example, Denholm asserts there is an "inconsistency between the evidence and the court's ruling

60

relating to the Aspen Mountain Club" and we must reduce the amount of damages awarded. In essence, he is arguing there is insufficient evidence to support the damage award.

Turning to the first alleged inconsistency, we conclude any error was harmless. It is true the statement of decision incorrectly stated, "Denholm committed fraud by concealment." However, Denholm acknowledges the final judgment filed May 6, 2011, properly reflects the court's ruling he did not commit fraud by concealment. Denholm does not explain how he was harmed by this inconsistency. Damages were not awarded for this claim. We find no reason to reverse the judgment that properly states Denholm prevailed on the concealment cause of action.

Denholm's other argument related to whether the evidence supports the court's calculation of damages. He challenges the court's decision to award (1) damages of $25,000 plus $13,041 interest regarding the Aspen Mountain Club, (2) damages of $387,386 plus $116,215.80 interest regarding the Catania deal, and (3) award the Trust management fees relating to CALCO I.

*1. Standard of Review*

"'In reviewing the sufficiency of evidence on appeal, we resolve all conflicts in favor of the prevailing party and we indulge all legitimate and reasonable inferences to uphold the verdict if possible. "It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury . . . ." [Citation.]' [Citation.] '"[W]e have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom." [Citations.]' [Citation.]" (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 527.) We will address each claim separately.

61

## 2. *The Aspen Mountain Club*

Denholm asserts the court improperly awarded the Trust $25,000 plus $13,041 interest for the Aspen Mountain Club. He asserts the uncontroverted evidence was that the $25,000 loan was repaid in full plus $4,128.08 interest. He states the January 31, 2005, loan was paid back in full on June 13, 2007. Denholm adds that he, Whitman, and Alexandria Fink all testified the Aspen Mountain Club investment was repaid with interest and therefore the court erred in adding this loan to the award of damages.

To support this claim, Denholm refers extensively to trial exhibit No. 4441. This exhibit was not included in our record. He also refers to trial exhibit No. 4563 (pages 4 through 6) and exhibit No. 4565. And while these exhibits are contained in the record, they provide little support for Denholm's argument. Exhibit No. 4563 contains pages 1, 2 and 4 (3, 5, and 6 are missing). Page 4 of this exhibit contains a copy of a $31,005 check Denholm wrote to the Trust on December 31, 2006. Exhibit No. 4565 consists of 2 pages depicting two checks both dated May 30, 2007, for $178,512.44 and $25,000 respectively. He asserts this evidence conclusively proves he repaid the loan plus interest on June 13, 2007.

This conclusion requires a giant leap of faith. The checks do not indicate what the payments related to. And although Denholm, his expert witness, and his former employee all provided testimony supporting this argument, we find it very telling that Denholm fails to mention the evidence the Holts presented on this issue. In the Holts' respondents' brief, they explain their expert, Skorheim, included the $25,000 loan and calculated $13,041.10 interest as part of the damages owed to the trust. Exhibit No. 2846, prepared by Skorheim, supports this assertion. In his reply, Denholm does not attempt to explain why this evidence does not support the court's judgment. We deem the issue waived due to Denholm's explicit failure to discuss or discredit evidence presented by the Holts on this issue.

62

"[A]n attack on the evidence without a fair statement of the evidence is entitled to no consideration when it is apparent that a substantial amount of evidence was received on behalf of the respondent. [Citation.] Thus, appellants who challenge the decision of the trial court based upon the absence of substantial evidence to support it '"are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence*. Unless this is done the error is deemed waived." [Citations.]' [Citation.]" (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 (*Nwosu*).)

### 3. The Catania Deal

Denholm asserts the court erred in including the Catania deal ($387,386 plus $116,215.80 interest) as part of the damage award. He explains this transaction involved Vander, which he admittedly formed using the Trust's assets. Denholm and Vander made several investments. Denholm relies on his own self-serving testimony to prove he invested $200,000 of his own funds to invest with Vander in Vander Business Center. When it was sold, the proceeds were rolled over into the Catania property in a 1031 exchange. Denholm asserted he personally owned 40 percent of Vander Business Center, and therefore also owned 40 percent of the Catania property. When Catania was sold, Denholm admits he received $387,836, but because he invested $200,000 of his own money, his profit was only $184,555. He adds the court in calculating disgorgement of profits regarding his self-dealing with Vander also included the rent he received from his interest in the Catania property. He maintains the above evidence supports the conclusion this court should delete the damage award relating to the Catania ($387,386 plus $116,215.80 interest), because his profit was much less than $387,836 and the Catania damages were included in the calculation of damages relating to Vander.

Once again, Denholm fails to even acknowledge the evidence offered by the Holts, and relied on by the court, regarding Catania. In their briefing, the Holts assert there was no error or duplication of damages. The court simply rejected Denholm's argument and evidence. They cite to Skorheim's testimony and his written calculation of

63

damages reflected in exhibits Nos. 2846 and 2848.  As stated above, "[A]n attack on the evidence without a fair statement of the evidence is entitled to no consideration when it is apparent that a substantial amount of evidence was received on behalf of the respondent. [Citation.]" (*Nwosu, supra,* 122 Cal.App.4th at p. 1246.)  Denholm was required to set forth *all the material evidence* and not merely his own evidence.

Moreover, we note Denholm's lengthy recitation of the facts contains very few supporting citations to the reporter's transcript.  For example, on pages 100 and 101 of the briefing, Denholm summarizes the "unrefuted testimony from Alexandria Fink" without including a single citation to the record in dramatic noncompliance with basic rules of appellate procedures.  "'The appellate court is not required to search the record on its own seeking error.' [Citation.]  Thus, '[i]f a party fails to support an argument with the necessary citations to the record, . . . the argument [will be] deemed to have been waived. [Citation.]' [Citations.]" (*Nwosu, supra,* 122 Cal.App.4th at p. 1246.)  For both of the reasons stated above, we deem the issue waived.

*4. Management Fees*

Denholm maintains the court erroneously included the $60,000 management fee he received from HGC.  He notes the statement of decision originally stated $6,900, but then the court granted the Holts' request to increase the amount to $60,000 to represent 10 months of $6,900.  Denholm claims he and his business partner testified this advance on profits was repaid to HGC.  Once again, it appears Denholm has failed to provide this court with all the material evidence presented below and not merely his own self-serving evidence.  We deem the argument waived. (*Nwosu, supra,* 122 Cal.App.4th at p. 1246.)

*E.  Constructive Fraud*

Denholm argues insufficient evidence supports the court's conclusion he was liable for constructive fraud (second cause of action).  We disagree.

The court ruled the factual basis for its ruling was as follows: "Denholm . . . breached his fiduciary duty of loyalty by borrowing money from the Trust and engaging in self-dealing transactions. Denholm obtained monies from the Trust for his own personal use and benefit and used [the] Trust for his own personal use and benefit." The court stated the legal basis for its ruling was as follows: "Denholm as [t]rustee of the Trust, was a fiduciary. (*Wolf v. Mitchell, Silberberg & Knupp* (1999) 76 Cal.App.4th 1030; *Copley v. Copley* (1981) 126 Cal.App.3d 248.) Constructive fraud is a species of fraud applicable to a fiduciary. (*Michel v. Moore & Associates Inc.* (2007) 156 Cal.App.4th 756, 763.) A breach of fiduciary duty constitutes constructive fraud. (Civ. Code, § 1573, *Salahudin v. Valley of California, Inc.* (1994) 24 Cal.App.4th 555, 563.)"

Civil Code section 1573 defines constructive fraud as "1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or, [¶] 2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud."

Relying on *Estate of Gump* (1991) 1 Cal.App.4th 582, Denholm argues that without absence of reliance, there is insubstantial evidence to support liability for constructive fraud. He misconstrues the holding of the case. The *Estate of Gump* court recognized reasonable reliance is presumed because of a fiduciary relationship. (*Id.* at p. 601.) When a fraud claim is based upon a misrepresentation or nondisclosure by a fiduciary, "the reliance element is relaxed . . . to the extent we may presume reasonable reliance . . . absent direct evidence of a lack of reliance." (*Ibid.; Edmunds v. Valley Circle Estates* (1993) 16 Cal.App.4th 1290, 1302 ["a representation in the context of a trust or fiduciary relationship creates a rebuttable presumption of reasonable reliance subject to being overcome by substantial evidence to the contrary"].) In other words,

65

reliance by the beneficiaries is presumed absent direct evidence to the contrary, and Denholm has not identified any such evidence. We will not disturb the court's judgment.

*F. Judicial Notice*

Denholm requested this court take judicial notice of a minute order filed in probate court as well as the Holts' petition for an accounting filed in probate court. He explains the trial court took judicial notice of the first document but not the second. Evidence Code section 452, subdivision (d)(2), permits judicial notice of the records of "any court of record of the United States or of any state of the United States." The documents at issue fit this description, and therefore, we grant the request for judicial notice.

IV

The judgment is affirmed. In the interests of justice, each party shall bear their own costs on appeal.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


ARONSON, J.